# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 7, 2011       Decided December 30, 2011

No. 10-1093

FARMERS AND MERCHANTS MUTUAL TELEPHONE
COMPANY OF WAYLAND, IOWA,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

NORTHERN VALLEY COMMUNICATIONS, LLC, ET AL.,
INTERVENORS

On Petition for Review of Orders of
the Federal Communications Commission

*John F. Cooney* argued the cause for petitioner. With him on the briefs were *James U. Troup*, *Tony S. Lee*, and *Christine McLaughlin*.

*Ross A. Buntrock* argued the cause for intervenor Northern Valley Communications, LLC. With him on the briefs was *G. David Carter*. *Jonathan E. Canis* and *Stephanie A. Joyce* entered appearances.

*Joel Marcus*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Austin C. Schlick*, General Counsel, *Peter Karanjia*, Deputy General Counsel, and *Richard K. Welch*, Acting Associate General Counsel. *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, U.S. Department of Justice, and *Daniel M. Armstrong III*, Associate General Counsel, Federal Communications Commission, entered appearances.

*David H. Solomon* argued the cause for intervenors Qwest Communications Company, LLC, et al. With him on the brief were *Craig J. Brown, Russell P. Hanser*, *Robert B. McKenna*, *Charles W. McKee*, *Michael B. Fingerhut*, *Scott H. Angstreich*, *Gregory G. Rapawy*, *M. Robert Sutherland*, *Gary L. Phillips*, *Paul K. Mancini, Michael E. Glover*, *Karen Zacharia*, and *Christopher M. Miller*. *David L. Lawson* and *James P. Young* entered appearances.

Before: ROGERS, TATEL and KAVANAUGH, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: In the three challenged orders, the Federal Communications Commission addressed a "traffic pumping" (or access stimulation) scheme in which the holder of the filed tariff entered into contractual arrangements with conference calling companies and charged the interexchange carrier the tariff rate for providing switched access service. Interpreting the tariff to require switched access service to be provided to an end user, the Commission determined that the contractual arrangements were inconsistent with the subscriber relationship required by the tariff and violated 47 U.S.C. §§ 201(b) and 203(c). The Commission also determined, in the alternative, that the tariff holder had exceeded the permissible rate of return under the tariff and violated 47 U.S.C. § 201(b). Farmers & Merchants Mutual Telephone Company ("Farmers"),

the holder of the tariff, petitions for review on the grounds that in addition to ignoring jurisdictional requirements, the Commission misread the tariff and failed to adhere to its precedent and rules. For the following reasons, we deny the petition.

**I.**

In May 2007, Qwest Communications Corporation ("Qwest"), an interexchange carrier ("IXC") receiving access services from Farmers, filed a complaint alleging that Farmers was collecting "unreasonably high terminating switched access charges by inflating the amount of traffic delivered to it by Qwest and other [IXCs] in a manner that rendered Farmers's rates wholly unrelated to its costs." Compl. at 1. Qwest argued the charges to it were unlawful under sections 201(b) and 203(c) of the Communications Act of 1934, as amended, and elected to have the amount of any damages determined in a separate proceeding. In response, the Commission issued the challenged orders:

- In *Farmers I*,[1] the Commission ruled that Farmers had violated section 201(b) by earning an excessive rate of return, but Qwest could not recover damages because Farmers' tariff was "deemed lawful" under 47 U.S.C. § 204(a)(3). In its answer to the complaint, Farmers stated that the conference calling companies were subscribers to Farmers' interstate access service and were billed the federal subscriber line charge as well as for local telephone service and rental of floor space in Farmer's central office (where the conference bridges were located). Answer at vii.

---

[1] *Qwest Comm'cns Corp. v. Farmers & Merchants Mutual Tel. Co.* ("*Farmers I*"), 22 FCC Rcd. 17973 (2007), 2007 WL 2872754 (F.C.C.).

- In *Farmers II*,[2] the Commission, after granting Qwest's request for partial reconsideration and initiating additional proceedings, found that new evidence supported Qwest's assertion that the conference calling companies, in fact, never took tariffed services from Farmers.[3] The Commission found that because the companies were not end users under the tariff, "Farmers' transport of traffic to them did not constitute 'switched access' under the tariff" and therefore Farmers' corresponding charges to Qwest were unlawful under sections 201(b) and 203(c) of the Communications Act. *Farmers II*, 24 FCC Rcd. at 14813. The Commission also reaffirmed its ruling on Farmers' unreasonable rate-of-return. Consequently, Farmers had violated sections 201(b) and 203(c) and was liable to Qwest for damages.

- In *Farmers III*,[4] the Commission denied Farmers' petition for reconsideration, rejecting challenges to its authority to issue *Farmers II* and its determination that the companies were not "end users" under Farmers' tariff.

---

[2] *Qwest Comm'cns Corp. v. Farmers & Merchants Mutual Tel. Co.* ("*Farmers II*"), 24 FCC Rcd. 14801 (2009), 2009 WL 4073944 (F.C.C.).

[3] The new evidence regarding Farmers' relationships to the conference calling companies came to light in a parallel proceeding before the Iowa Utility Board. *Farmers II,* 24 FCC Rcd. at 14804. That evidence indicated that contract amendments and bills for services had been executed or created at dates much later than would have been apparent from their face. *See id.* at 14812.

[4] *Qwest Comm'cns Corp. v. Farmers & Merchants Mutual Tel. Co.* ("*Farmers III*"), 25 FCC Rcd. 3422 (2010), 2010 WL 972315.

5

II.

As a threshold matter, Farmers, joined by intervenor Northern Valley Communications, LLC ("Northern Valley"), contends that the Commission lacked authority to overturn its decision in *Farmers I* because it failed, as 47 U.S.C. § 405(b) requires, to act within 90 days on Qwest's petition for partial reconsideration and, consequently, *Farmers I* became a final, appealable order. This contention is based on a misreading of the statute.

Section 405(b) requires the Commission to "issue an order granting or denying" a petition for reconsideration within 90 days, 47 U.S.C. § 405(b)(1), and provides that any such order granting or denying a petition shall be a final, appealable order, *id.* § 405(b)(2). By its plain terms, this provision does not speak to the finality of the original order for which reconsideration is sought, but rather to the Commission's need to grant or deny a petition for reconsideration. *See Chevron U.S.A. Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).

The Commission granted in part Qwest's petition for partial reconsideration on January 29, 2008, within 90 days after Qwest filed its petition on November 1, 2007. In its order, the Commission initiated additional proceedings to compel production of and to consider previously undisclosed evidence. Qwest's Second Supplement to Petition for Reconsideration was submitted as part of the additional proceedings, and was not, the Commission maintains, a separate petition for reconsideration of an order, decision, report, or action taken by the Commission. The Commission's interpretation of section 405 and its rule, *see* 47 C.F.R. § 1.106, as allowing it to defer a ruling on the merits pending completion of the additional proceedings appears reasonable and entitled to deference. *See Chevron*, 467 U.S. at 843. But even if the Commission had missed the 90-day

deadline, it would not have lost jurisdiction to issue *Farmers II* because Congress established no consequence for failing to meet that deadline.[5] *See Brock v. Pierce Cnty.*, 476 U.S. 253, 265–66 (1986); *Gottlieb v. Pena*, 41 F.3d 730, 733 (D.C. Cir. 1994); *AT&T Corp. v. Beehive Tel. Co.*, 17 FCC Rcd. 11641, 11652 & n.80 (2002). Contrary to intervenor Northern Valley's contention during oral argument, we find nothing in the legislative history to support a contrary reading of section 405. *See* S. REP. NO. 100-142 (1987).

Farmers' suggestion that the Commission lacked subject matter jurisdiction *ab initio* over Qwest's complaint "is flatly wrong." Resp't's Br. at 38. Farmers maintains that if the Commission was correct that Qwest was not required to pay Farmers' access-service tariff rates, then the service Farmers provided was not a common-carrier service offered in a tariff and the Commission exceeded its authority by considering Qwest's complaint under the Communications Act's Title II common-carrier provisions. The Commission had jurisdiction to consider Qwest's complaint pursuant to 47 U.S.C. § 208(a), which provides authority to adjudicate complaints "of anything done or omitted to be done by any common carrier" in violation of the Communications Act. Farmers held itself out as a common carrier providing access service to IXCs such as Qwest and billed

---

[5] A similar analysis disposes of intervenor Northern Valley's contention that the Commission lost its authority to act after 90 days (47 U.S.C. § 405(b)) and five months (47 U.S.C. § 208(b)), and that *Farmers I* was therefore a final order. Rule 1.106(n), 47 C.F.R. § 1.106(n), which requires compliance with a Commission order subject to a petition for reconsideration, does not, as Northern Valley implies, address the Commission's authority to conduct proceedings after the 90-day deadline, much less require the Commission to stay *Farmers I* inasmuch as it granted partial reconsideration of that order.

Qwest for that service. Section 203(c)(3) makes unlawful a common carrier's provision of service outside of the terms of its tariff; Qwest's complaint alleged Farmers violated section 203(c) and a Commission ruling Farmers did so could not immunize it from the complaint process.

### III.

The merits question is whether the Commission properly determined that Farmers was not entitled to bill Qwest for access service under Farmers' tariff because Farmers had not provided interstate "switched access service" as that term is defined in Farmers' federal access tariff. In matters of tariff interpretation, the court applies a deferential standard of review and will uphold the Commission's interpretation where it is "reasonable [and] based upon factors within the Commission's expertise." *Global NAPs, Inc. v. FCC*, 247 F.3d 252, 258 (D.C. Cir. 2001) (internal citation omitted).

The Commission relied on three key provisions in Farmers' tariff in concluding that the tariff allowed Farmers to provide (and bill for) switched access service only when it delivers a call to an end user, i.e., a person or entity that subscribes to Farmers' service under the tariff. At the relevant time, Farmers was operating under the Kiesling Associates LLP FCC Number 1 Tariff ("Kiesling Tariff"), which incorporates provisions of the National Exchange Carrier Association FCC Tariff Number 5 ("NECA Tariff"), *e.g.*, Kiesling Tariff §§ 2, 6. Under Farmers' tariff: (1) "switched access" means a service that allows an IXC "to terminate calls from a customer designated premises to an *end user's* premises." NECA Tariff § 6.1 (emphasis added). (2) The term "end user" means "any *customer* . . . that is not a carrier." *Id.* § 2.6 (emphasis added). (3) "Customer" means an entity that "*subscribes* to the services offered under th[e] tariff." *Id.* (emphasis added). The Commission therefore determined

that Farmers may provide and bill for switched access service only when it delivers a call to an entity that "subscribes" to that service under its tariff. Whether the conference calling companies subscribed to switched access service under Farmers' tariff turns on the nature of Farmers' relationship with the companies, a subject demonstrably within the Commission's expertise.

The Commission found that "in numerous respects," *Farmers III*, 25 FCC Rcd. at 3426, the conference calling contracts did not establish a subscriber relationship under Farmers' tariff. The evidence showed that the conference calling companies never paid subscriber line charges or made any other payments to Farmers, and that Farmers never expected to be paid. *See id.* The Commission also found, for several reasons, that Farmers and the conference calling companies did not structure their relationship in a manner consistent with Farmers' tariff as evidenced by the contract terms and Farmers' conduct. *Id.* As examples, the Commission cited the exclusivity provisions in the conference calling contracts, a practice "antithetical to the notion of tariffed service," *Farmers II*, 24 FCC Rcd. at 14807, and the fact that Farmers used different technology than it used for other customers, *id.* at 14806, and each company enjoyed individually negotiated terms and conditions, *id.* at 14807. Unlike its practice with other customers, Farmers did not send regular bills or enter the companies into its billing system, *id.* at 14808. Neither did Farmers pay the federal universal service charge that would have accrued for service provided to a subscriber, *id.* at 14813 n.97. Further, Farmers agreed not to charge the conference calling companies for services, the subscriber line charge, equipment installation, or space in Farmers' central office. *Id.* at 14806 & nn.48, 49. And after the Qwest complaint proceedings began, Farmers created backdated bills and contract amendments while advising the conference calling companies they still did not have

to pay, *id.* at 14808-10. Based on these findings, which Farmers does not challenge, the Commission concluded that Farmers never intended to treat the conference calling companies as customers of any of Farmers' tariffed services. Its findings demonstrate, moreover, that the Commission's decision in *Farmers II* did not hinge upon the single issue of whether the conference calling companies were required to make payments to Farmers in order to be considered subscribers of Farmers' services. *Farmers III*, 25 FCC Rcd. at 3426.

Farmers' challenges to the Commission's interpretation of the tariff fail to show the Commission was unreasonable or considered factors outside of its expertise such that deference would not be appropriate:

1. Farmers maintains that the Commission ignored the plain terms of the tariff, which require Qwest to pay the tariff rate regardless of whether the conference calling companies were end users. It points to several subsections of section 6.1 that do not refer to end users, *see, e.g.*, NECA Tariff §§ 6.1.3(A), 6.4.1(C), in contending that general rules of construction require specific provisions of the tariff to control over the general. The Commission persuasively responds that the general definition of section 6.1 is incorporated into the subsequent, more-specific provisions of section 6.

First and foremost, the tariff itself includes a diagram of switched access service that illustrates an end user as one of the sub-elements of that service. *See* NECA Tariff § 6.1.3. Additionally, under the rules of construction for the NECA Tariff, each of the subsections is "subordinate to and dependent on [the] next higher level" of the tariff. NECA Tariff, Tariff Users Guide, at 30; *see* Kiesling Tariff, Tariff Users Guide at 4 (noting incorporation of NECA Tariff language). The Commission's reading of the tariff thus was well within its

discretion. *See Diamond Int'l Corp. v. FCC*, 627 F.2d 489, 492 (D.C. Cir. 1980).

Farmers' other arguments also fail to show deference is not due to the Commission's interpretation that switched access service under the tariff requires service to an end user. Farmers' reliance on *In re Investigation of Access & Divestiture Related Tariffs* ("*Tariff Investigation*"), 97 F.C.C. 2d 1082, 1229 (1984), where the Commission expressed discomfort with the "fragmentary description" of switched access service in section 6.1 of the NECA Tariff, is misplaced; the tariff language has since been changed to clarify that section 6.1 contains a unitary definition of switched access service, *compare* NECA Tariff § 6.1, Petr.'s Br. Addendum at A-74 *with* prior version of § 6.1 quoted in *Tariff Investigation*, 97 F.C.C. 2d at 1229. Farmers' reliance on general rules of contract construction is similarly misplaced; the relevant contract-law principle applies when general and specific provisions conflict, *see Mutual Life Ins. Co. v. Hill*, 193 U.S. 551, 558 (1904), and Farmers fails to show such conflict exists here.

2. No more successful is Farmers' challenge to the Commission's alternative ruling that even if the service it provided to Qwest constituted "switched access" under the tariff, Farmers exceeded the allowable rate of return and thereby violated 47 U.S.C. § 201(b), *Farmers III*, 25 FCC Rcd. at 3427–28. Farmers contends that this alternative ground was erroneous because the Kiesling Tariff had previously been "deemed lawful" under 47 U.S.C. § 204(a)(3). Two responses suffice.

First, the Commission identified two independent bases for section 201(b) liability. It found that Farmers did not provide Qwest with "switched access" under its tariff, and that its practice of charging Qwest for such service was therefore unjust

and unreasonable under section 201(b). *See Farmers III*, 25 FCC Rcd. at 3427–28. The service provided by Farmers to the conference calling companies was not a tariffed service and so Farmers' assessment of switched access charges to Qwest violated sections 201(b) and 203(c) of the Communications Act. *Id.* The Commission identified the rate-of-return violation as an alternative and independent basis for Farmers' section 201(b) liability. *Id.* As clarified in *Farmers III*, "[e]ven if the carriage of traffic from Qwest to the conference calling companies could be said to constitute switched access under Farmers' tariff, . . . the Commission could have reached the same conclusion [as to liability] by finding that Farmers' earning an excessive rate of return violated section 201(b) of the Act." *Id.*

Second, the Commission's alternative basis for section 201(b) liability did not violate any principles regarding retrospective relief. Farmers' rates were deemed lawful and not subject to refund until the Commission determined otherwise, *see Virgin Islands Tel. Corp. v. FCC*, 444 F.3d 666, 669 (D.C. Cir. 2006), as it did in view of new evidence. Nothing in *Farmers III* imposes a retrospective refund: rather the Commission found that the rates could properly serve as a basis for section 201(b) liability even if they had been properly charged under the tariff and Qwest thus could qualify for prospective relief.

3. Farmers contends that even if Qwest's obligation to pay access service tariff rates depended on whether the conference calling companies were end users, the Commission was arbitrary and capricious and acted contrary to law and principles of due process by departing from its precedent without explanation. Farmers points to the *Jefferson Telephone* cases,[6] which it reads

---

[6] *AT&T Corp. v. Jefferson Tel. Co.* ("*Jefferson II*"), 16 FCC Rcd. 16130 (2001); *In re Jefferson Tel. Co.*, Notice of Apparent

to stand for the proposition that business arrangements inconsistent with a tariff are immaterial so long as the conference calling companies that do business with the tariff holder "enter[] their names for" the access service covered by the tariff. Farmers then invokes the filed rate doctrine, which generally requires that all parties that take service under a tariff pay the tariff rate, *e.g., Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981). Farmers' reliance on this precedent is to no avail.

The Commission's decision did not contravene its holdings in the *Jefferson Telephone* cases. As a preliminary due process matter, *Jefferson I* is under judicial seal and was made available to Qwest only upon order of this court of September 2, 2010. Not only was Qwest deprived of this authority during the proceedings before the Commission, the Commission was deprived of the benefit of an adversarial process and was unable to discuss the *Jefferson I* opinion in any detail in its decision. Commission rules prohibit reliance on unpublished orders, "except against persons who have actual notice of the document . . . or by such persons against the Commission." 47 C.F.R. § 0.445(e). Qwest did not have notice of *Jefferson I* until this appeal. In *Jefferson II*, which is not under seal, the Commission "emphasize[d] the narrowness of [its] holding" and limited it to "the specific facts and arguments presented." 16 FCC Rcd. at 16137. The issue there was whether a local exchange carrier's inducement of conference call traffic was inconsistent with a common carrier's duty to carry traffic indifferently, *id.* at 16133–34, and whether revenue sharing between the carrier and the conference calling company violated section 202(a)'s restriction on "undue or unreasonable preference[s]," *id.* at 16136 n.38. But, although the IXC was ordered to pay the access service tariff rate, the Commission neither mentioned the filed

Liability for Forfeiture & Order to Show Cause ("*Jefferson I*"), FCC Order No. 96-430 (1996).

rate doctrine nor indicated that it applied to the dispute. Indeed, neither of the *Jefferson Telephone* cases established that conference calling companies are end users under the NECA Tariff; tariffed service appears to have been assumed, *see id.* at 16131–32; Letter Ruling, Nov. 10, 2010, FCC Deputy Chief, Market Disputes Resolution Div., Enforcement Bureau, at 4 (discussing *Jefferson I*). Consequently, in the absence of relevant holdings by the Commission, the Commission properly applied the principles of tariff interpretation to Farmers' tariff and adequately distinguished relevant precedent, an approach consistent with due process.

Second, Farmers fares no better in invoking the filed rate doctrine. Because the Commission could properly conclude that the conference calling companies were not end users under the tariff, tariffed services are not at issue. Therefore, as explained in *Farmers II*, the filed rate doctrine does not apply. The Commission has long instructed that a service that does not "fall within the plain meaning" of the tariff is not governed by the tariff whether or not it is "functionally similar" to a tariffed service. *W. Union Corp. v. S. Bell Tel. & Tel. Co.*, 5 FCC Rcd. 4853, 4855 (1990); *see also* 47 U.S.C. § 203(c); *New Valley Corp. v. Pac. Bell*, 15 FCC Rcd. 5128, 5132–33 (2000). Although it did not decide how traffic to the conference calling companies should be classified, *see Farmers III*, 25 FCC Rcd. at 3427 n.43, the Commission based its conclusion, that in the absence of an end user such traffic did not constitute switched access service under the tariff, on the controlling plain text of Farmers' tariff. The service was outside of the tariff and, as such, the filed rate doctrine could not protect Farmers from liability to Qwest.

To the extent Farmers contends the Commission acted contrary to its rules, the Commission observes, as it did in *Farmers II*, that "Farmers' tariff may have defined switched

access more narrowly than was permissible under [its] rules."[7] Resp't's Br. at 49.  In any event, the rules governing what local exchange carriers must include in their tariffs, *see, e.g.*, 47 C.F.R. §§ 69.4, 69.5, neither apply to the IXCs nor limit the Commission here.  If Farmers' tariff did not apply to the services it was providing to Qwest, then Farmers violated such rules, not the Commission.  Farmers' reliance on 47 U.S.C. § 202(a), prohibiting discrimination of charges for like services to like parties, also fails because the services billed to Qwest were for tariffed services it did not receive.  Intervenor Northern Valley likewise gains no traction on a section 202(a) claim by noting that Qwest may recover damages in connection with services for which other IXCs have already paid.

4. Finally, Farmers suggests that in *Farmers II* the Commission retroactively applied a new standard for being a subscriber under the tariff without fair notice or reasoned analysis; this contention, however, ignores the fact that in *Farmers I* the Commission relied on Farmers' answer to the complaint stating that the conference calling companies were subscribers, paying and being billed monthly.  "On reconsideration, the landscape shifted dramatically" because "[t]he record contained many more facts about the relationship between Farmers and the conference calling companies." *Farmers III*, 25 FCC Rcd. at 3426.  The Commission concluded: "Farmers withheld critical evidence during the earlier stages of this proceeding, and it now attempts to bind the Commission to

---

[7] Hence, Farmers' reliance on the Commission's description of what its rules allow in the *Report and Order and Further Notice of Proposed Rulemaking, In re Connect America Fund*, FCC Order No. 11-161, at 216, 2011 WL 5844975, at \*168 (Nov. 18, 2011), does not help its cause.  Letter of Nov. 29, 2011 from John F. Cooney, Counsel for Farmers, to Mark J. Langer, Clerk of Court, filed pursuant to FED. R. APP. P. 28(j).

a ruling that was predicated upon the incomplete factual record. On reconsideration, the Commission is entitled to review new facts and to change its ruling based on the new facts," which "is precisely what happened here . . . ." *Id.* at 3426–27. Intervenor Northern Valley's suggestion that the Commission erred by not examining the state tariff to consider Farmers' relationship with the conference calling companies is not properly before the court: the Commission was not given an opportunity to pass on it, 47 U.S.C. § 405(a); *Environmentel, LLC v. FCC*, 661 F.3d 80, 84 (D.C. Cir. 2011); *Bartholdi Cable Co. v. FCC*, 114 F.3d 274, 279 (D.C. Cir. 1997); and an intervenor cannot raise issues not raised in Farmers' brief, *see Ill. Bell Tel. Co. v. FCC*, 911 F.2d 776, 786 (D.C. Cir. 1990).

In sum, the Commission, upon considering factors within its expertise, could reasonably conclude that Farmers' relationships with the conference calling companies had been deliberately structured to fall outside the terms of Farmers' tariff and therefore reasonably reject such services as tariffed services. Deference to the Commission's determination is thus appropriate. *See Global NAPs*, 247 F.3d at 257–58; *Diamond Int'l*, 627 F.2d at 492. To the extent Farmers protests what it characterizes as a "windfall" for Qwest, Oral Argument at 1:34, whether Farmers can set off, and to what extent, its costs of providing service against Qwest's claim for damages is not before the court. *See Farmers III*, 25 FCC Rcd. at 3424 & n.19; Compl. at 27, ¶ 59. Accordingly, we deny the petition.