# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 31, 2017         Decided August 11, 2017

No. 15-1354

ALL AMERICAN TELEPHONE COMPANY, INC., ET AL.,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

AT&T CORP.,
INTERVENOR

———

On Petition for Review of an Order of
the Federal Communications Commission

———

*Jonathan E. Canis* argued the cause and filed the briefs for petitioners.

*C. Grey Pash, Jr.*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Robert B. Nicholson* and *Jonathan H. Lasken*, Attorneys, U.S. Department of Justice, *Jonathan B. Sallet*, General Counsel at the time the brief was filed, Federal Communications Commission, *David M. Gossett*, Deputy General Counsel, and *Richard K. Welch*, Deputy Associate

General Counsel. *Jacob M. Lewis*, Associate General Counsel and *Lisa S. Gelb*, Attorney, Federal Communications Commission, entered appearances.

*James F. Bendernagel Jr.* and *Michael J. Hunseder* were on the brief for intervenor in support of respondents.

Before: TATEL, GRIFFITH, and MILLETT, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: The Federal Communications Commission held that Petitioners All American Telephone Co., e-Pinnacle Communications Inc., and Chasecom improperly engaged in a scheme designed to collect millions of dollars in unwarranted long-distance access charges from AT&T. All American and the other petitioning companies do not challenge that liability determination. They challenge only the Commission's award of damages to AT&T and statements in the Commission's decision that refer to the merits of the companies' state-law claims against AT&T, which are pending in a separate action in the Southern District of New York. We uphold the Commission's award of damages, but vacate those aspects of the Commission's order that tread on the merits of the companies' state-law claims.

**I**

**A**

The Federal Communications Commission regulates common-carrier providers of wired telephone services, including the fees that they charge to customers. *See* 47 U.S.C. § 201. One of the fees that the Commission regulates is for "exchange access services" rendered for long-distance

telephone calls. *See* 47 C.F.R. § 61.26. Those fees are often referred to as "access charges." They work like this: When a person places a long-distance call, a local exchange carrier operating in the caller's geographic area will route the call to an "interstate exchange carrier," also known as an "interexchange carrier." That interexchange carrier, in turn, will connect the call to the recipient's local exchange carrier. When the recipient's local exchange carrier completes the call to the recipient, the interexchange carrier must pay an access charge to the local carrier for the connection service. *See Northern Valley Communications, LLC v. FCC*, 717 F.3d 1017, 1018 (D.C. Cir. 2013).

When it comes to determining the amount of that access charge, however, not all local carriers are the same under federal communications law. As part of an effort to encourage competition, federal law divides local carriers into "incumbent local exchange carriers" and "competitive local exchange carriers." *See United States Telecom Ass'n v. FCC*, 359 F.3d 554, 561 (D.C. Cir. 2004) (noting Congress's intent "to foster a competitive market in telecommunications"). Incumbent carriers are those that, on or prior to February 8, 1996, provided service to a particular area or were part of an exchange carrier association. 47 U.S.C. § 251(h). Competitive carriers are all other local carriers, including new carriers that entered the market after that time period and compete with the incumbent carriers within a specific geographic region. *See* 47 C.F.R. § 51.903(a).

Incumbent carriers cannot impose access charges unless they file a valid tariff with the Commission. *See* 47 U.S.C. § 203(a). Competitive carriers, by contrast, can impose access charges at or below a Commission-determined rate by filing their own tariff, or they can impose access charges through a contract they individually negotiate with the interexchange

carrier. *See* 47 C.F.R. § 61.26(b); *Hyperion Telecomms.*, 12 FCC Rcd. 8596, 8613 (1997).

**B**

It has been said that "[t]he darkest hour of any man's life is when he sits down to plan how to get money without earning it."[1] But that does not seem to keep people from trying. Through a scheme known as "traffic pumping" or "access stimulation," some local exchange carriers sought to artificially inflate the number of local calls they could connect, thereby increasing both the call volume and the rates that they could charge interexchange carriers. More specifically, a local exchange carrier would enter into a contractual relationship with a company that generates a high volume of telephone calls, such as a conference calling provider or a provider of sexually explicit chat lines. The local carrier would house the phone-call-generating partner's equipment on its premises for free and would sometimes even provide the equipment itself at no cost. Not only would the local carrier forgo charging its partner for the phone calls that came in, but in fact the carrier would pay the partner a share of the per-minute long-distance access rates it charged the interexchange carriers. *See, e.g.*, *Qwest Communications Corp. v. Free Conferencing Corp.*, 837 F.3d 889, 893–894 (8th Cir. 2016); *Northern Valley*, 717 F.3d at 1018.

Those traffic-pumping arrangements were a "win-win" for the local carrier and its phone-call-generating partner. *Northern Valley*, 717 F.3d at 1018. The local carrier received a higher call volume and thus more revenue from access charges, while the partner got free service for its business plus a cut of the local carrier's revenue. On the losing end, however,

---

[1] Attributed to Horace Greeley.

were the public and the interexchange carriers "who ha[d] to * * * pay significant amounts to" the local exchange carriers in the form of artificially inflated and distorted access charges to complete the long-distance calls. *Id.* at 1018–1019.

Starting in 2010, the Commission issued a series of orders concluding that such traffic-pumping schemes were unlawful under Sections 201(b) and 203(c) of the Communications Act, 47 U.S.C. §§ 201(b), 203(c). The Commission ruled in particular that local exchange carriers could not charge interexchange carriers to connect long-distance calls to a non-paying end user. *See, e.g.*, *Qwest Communications Co. v. Sancom, Inc.*, 28 FCC Rcd. 1982 (2013); *Qwest Communications Co. v. Northern Valley Communications, LLC*, 26 FCC Rcd. 8332 (2011), *aff'd*, *Northern Valley*, 717 F.3d at 1017; *AT&T Corp. v. YMax Communications Corp.*, 26 FCC Rcd. 5743 (2011); *Qwest Communications Corp. v. Farmers & Merchants Mut. Tel. Co.*, 24 FCC Rcd. 14801 (2009), *aff'd*, *Farmers & Merchants Mut. Tel. Co. v. FCC*, 668 F.3d 714 (D.C. Cir. 2011).

We have twice upheld that interpretation of the Communications Act by the Commission. *See Northern Valley*, 717 F.3d at 1019; *Farmers*, 668 F.3d at 724. Accordingly, it is now "well-settled that a [local exchange carrier] cannot bill an [interstate exchange carrier] under its tariff for calls 'terminated' at a conference call bridge when the conference calling company does not pay a fee for th[ose] services." *Qwest Communications*, 837 F.3d at 894.

## C

Petitioners All American Telephone Co., e-Pinnacle Communications, Inc., and Chasecom (collectively, "the Companies") have held themselves out as competitive local

exchange carriers authorized to operate in Utah and Nevada. Standing behind them were Beehive Telephone Company, Inc. of Nevada, and Beehive Telephone Company, Inc. of Utah (collectively, "Beehive"), which operated as incumbent local exchange carriers in rural Nevada and Utah, respectively. Joy Enterprises, Inc., is a Nevada corporation that provides conferencing and sexually explicit chat line services. Until the early 2000s, Joy and Beehive were engaged in a classic traffic-pumping scheme: Beehive paid Joy kickbacks in exchange for the inflated traffic that Joy's conference and sexually explicit chat line services generated. Beehive, however, soon became a victim of its own success: As its traffic numbers skyrocketed, its access charge rates, which were determined by a filed tariff, began to plummet.

Unwilling to let a good scheme end, Beehive worked to create competitive local exchanges—the Companies—that would have greater rate flexibility. Beehive then had the Companies take its place in the arrangement. Beehive assisted the Companies in preparing and filing tariffs, and worked free of charge to obtain the necessary approval for All American to operate in the state of Utah. Beyond the regulatory paperwork, Beehive provided material support to all three Companies by serving as the co-lessee/guarantor for equipment rentals, installing and maintaining the Companies' equipment at Beehive's facilities, assigning them telephone numbers Beehive had obtained, and managing and coordinating the Companies' billings.

All American began operating in Beehive's territory in Utah in 2004, although it did not apply for a certificate of public convenience from the Utah Public Service Commission until 2006. *See In the Matter of the Consideration of the Rescission, Alteration, or Amendment of the Certificate of Authority of All American to Operate as a Competitive Local Exchange Carrier*

*within the State of Utah* at 1, No. 08-2469-01 (Utah Pub. Serv. Comm'n April 26, 2010) ("*Utah Commission Order*"). Shortly after All American obtained its certificate, Beehive and All American entered into an interconnection agreement that allowed All American to use Beehive's equipment for a fee, despite the fact that the Utah state license prohibited All American from operating in Beehive's territory. *Id.* at 6; *see* 47 U.S.C. § 252(d)(1) (addressing interconnection agreements).

The Companies that Beehive helped to create have never marketed their services to the general public or to businesses in Utah or Nevada. From the time it began operating, All American has served only a single client: Joy Enterprises. In addition, All American has never charged Joy Enterprises for its services.

Similarly, e-Pinnacle and Chasecom have only ever serviced conference-calling companies and have never charged them for their services. Like Joy Enterprises, e-Pinnacle and Chasecom engaged in a traffic-pumping kickback scheme with Beehive prior to becoming independent carriers.

In exchange for all of its free aid, Beehive was paid through the interconnection agreement with All American and through revenue-sharing schemes with e-Pinnacle and Chasecom. Beehive also directly benefited from the increased traffic generated by All American's arrangement with Joy Enterprises, and by e-Pinnacle's and Chasecom's arrangements with their conference-call providers, because Beehive could directly charge interexchange carriers other types of fees (such as tandem switching and transport fees) associated with the inflated traffic. Petitioners e-Pinnacle and Chasecom ceased operations in 2007. In 2010, the Utah Commission rescinded All American's certificate to operate as a competitive local

exchange carrier, concluding that it was "a mere shell company, paying others for technical services, management fees, consulting fees and equipment fees." *Utah Commission Order* at 18; *see also id.* at 35.

**D**

**1**

In 2007, the Companies filed a civil suit against AT&T Corporation in the United States District Court for the Southern District of New York. In their complaint, the Companies represented that they and AT&T were "telecommunications common carriers, and their interstate service offerings are subject to the jurisdiction of the FCC." First Amended Complaint ¶ 11, *All American Tel. Co. v. AT&T Corp.*, No. 07-cv-861 (S.D.N.Y. filed March 6, 2007). The Companies alleged that, pursuant to valid tariffs filed with the Commission, they had provided access services to AT&T for which AT&T had refused to pay. *Id.* ¶¶ 37–42. The Companies sought recovery of those access fees under both a tariff collection action, *id.* ¶¶ 73–76, and a state-law *quantum meruit* claim, *id.* ¶¶ 103–107.

In response, AT&T filed a counterclaim alleging that the Companies existed "for the sole purpose of executing 'traffic pumping' schemes, not to offer wireline local telephone service to the residents" in their service areas. Counterclaim ¶ 16, *All American Tel. Co. v. AT&T Corp.*, No. 07-cv-861 (S.D.N.Y. filed March 26, 2007). As relevant here, AT&T claimed that the Companies' conduct violated their filed tariffs and Sections 201 and 203 of the Communications Act, 47 U.S.C. §§ 201, 203. *Id.* ¶¶ 34, 43.

In March 2009, the district court *sua sponte* decided to refer AT&T's counterclaims arising under the Communications Act to the Federal Communications Commission pursuant to the primary jurisdiction doctrine. Memorandum & Order at 7, *All American Tel. Co. v. AT&T Corp.*, No. 07-cv-861 (S.D.N.Y. March 16, 2009). Under the primary jurisdiction doctrine, if "adjudicating a claim would 'require[] the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body,'" a court may "suspend the judicial process 'pending referral of such issues to the administrative body for its view.'" *United States v. Phillip Morris USA Inc.*, 686 F.3d 832, 837 (D.C. Cir. 2012) (alteration in original; citation omitted). The case is not "referr[ed]" to the agency in the traditional sense because there is usually "no mechanism whereby a court can on its own authority demand or request a determination from the agency[.]" *Reiter v. Cooper*, 507 U.S. 258, 268 n.3 (1993). Instead, the court "merely stay[s] its proceedings while the [parties] file[] an administrative complaint" and the agency disposes of it. *Id.*

Following the March 2009 referral, the district court entered a second order supplementing the issues referred and staying the litigation. Order Referring Issues to the Federal Communications Commission at 2, *All American Tel. Co. v. AT&T Corp.*, No. 07-cv-861 (S.D.N.Y. Feb. 5, 2010) ("Referral Order").

The key questions referred by the district court to the Commission were whether: (1) the Companies engaged in unreasonable conduct under the Communications Act; (2) the Companies provided services "pursuant to the terms of valid and applicable tariffs"; (3) the Companies "provide[d] some other regulated service to AT&T for which they are entitled to compensation"; (4) any recovery by the Companies "under a

quantum meruit, quasi-contract, or constructive contract theory" was permissible (*i.e.*, not preempted); and (5) AT&T "violate[d] § 201(b) or 203(a), or any other provision of the Communications Act" when it failed to pay the billed charges. Referral Order, *supra*, at 1, Ex. A.

**2**

To effectuate the referral, AT&T filed a complaint with the Commission. In its complaint, AT&T raised the first, second, third, and fourth questions. It also elected to bifurcate liability and damages, as permitted by Commission rules, *see* 47 C.F.R. § 1.722(d). AT&T's complaint alleged that the Companies, Joy, and Beehive engaged in a modified version of a traffic-pumping scheme, with the Companies serving as sham entities designed to unlawfully and unreasonably inflate the rate of access charges billed to AT&T.[2]

The Commission issued a decision on liability concluding that the Companies had "participated in an access stimulation scheme designed to collect in excess of eleven million dollars of improper terminating access charges from AT&T[.]" *AT&T Corp. v. All American Tel. Co.*, 28 FCC Rcd. 3477, 3477 ¶ 1 (2013) ("*Liability Order*"). In its *Liability Order*, the Commission found that the Companies were "'sham' [carriers] created to 'capture access revenues that could not otherwise be obtained by lawful tariffs,'" in violation of Section 201(b) of

---

[2] The Companies, in turn, filed a complaint that raised the fifth question. The Commission denied that complaint on the ground that the Communications Act does not regulate AT&T when it is acting as a customer. *All American Tel. Co. v. AT&T Corp.*, 26 FCC Rcd. 723, 732 ¶ 21 (2011) ("The law is settled that a carrier-customer's failure to pay tariffed access charges does not violate either section 201(b) or section 203(c) of the Act."). The Companies have not sought our review of that aspect of the Commission's decision.

the Communications Act, 47 U.S.C. § 201(b). *Liability Order*, 28 FCC Rcd. at 3487 ¶ 24.

The Commission further ruled that the Companies "had no intention at any point in time to operate as *bona fide* [carriers] or provide local exchange service to the public at large." *Liability Order*, 28 FCC Rcd. at 3488 ¶ 25. The Commission found that the Companies "neither owned nor leased facilities, nor did they purchase unbundled network elements typically used by [carriers] to provide any telecommunications services to the public." *Id.* Rather, "Beehive installed and maintained their equipment (which was collocated in Beehive's facilities), coordinated and managed their billing and collection services, and provided power and other services" needed by the Companies. *Id.* at 3483 ¶ 16 (footnotes omitted). Beehive's creation of the Companies "allowed the access stimulation arrangements [between Beehive and Joy] to continue at rates" that otherwise "would have been unsustainable." *Id.* at 3489 ¶ 27. On top of that, Beehive benefited from charging AT&T "for tandem switching and transport of the stimulated traffic." *Id.* at 3489 ¶ 28.

The Commission concluded that this arrangement "constitute[d] an unjust and unreasonable practice in violation of Section 201(b) of the Act." *Liability Order*, 28 FCC Rcd. at 3488 ¶ 24. It also ruled that the Companies' charges to AT&T were not made under a valid tariff because all of the customers served by the three Companies paid nothing for the service provided. *Id.* at 3494–3495 ¶ 38. Therefore, under *Farmers* and *Northern Valley*, the access charges were not incurred for switching services to an end user within the meaning of the Communications Act. *Id.* The Commission also noted that the Companies charged AT&T under a tariff for services that ended in Nevada, even though the actual "end user" was the conferencing equipment at Beehive's facility in Utah. *Id.* at

3492–3495 ¶ 35. Because the Companies did not have any valid tariffs for access charges applied to calls terminating in Beehive's territory in Utah, they had no authority under the Communications Act to charge AT&T for those services. *Id.* at 3493 ¶ 34.

The Commission denied the Companies' petition for reconsideration. *See AT&T Corp. v. All American Tel. Co.*, 29 FCC Rcd. 6393 (2014). The Companies did not seek further review of the Commission's liability determination or its factual findings.

**3**

Because of the bifurcation of liability and damages, the Commission conducted a second proceeding to determine whether AT&T should be awarded damages. The Companies objected that the Commission lacked jurisdiction over them, having found them to be sham entities. The Commission disagreed, reasoning that it had jurisdiction because the Companies had "held themselves out as 'providing services as common carriers,' and * * * operated with nationwide authority under" the Communications Act. *AT&T Corp. v. All American Tel. Co.*, 30 FCC Rcd. 8959, 8960 ¶ 8 (2015) ("*Damages Order*") (footnote omitted). Additionally, the Companies had "obtained state certificates to operate as [local exchange carriers], filed tariffs for their interstate services, and billed for those services[.]" *Id.* at 8961 ¶ 8; *see also id.* at 8961 ¶ 10 ("Defendants presented themselves to the public as common carriers and therefore are themselves subject to Section 208.").

The Commission then ordered the Companies to refund the $252,496.37 that AT&T had previously paid them in access charges. *Damages Order*, 30 FCC Rcd. at 8962 ¶ 11. The

Commission noted that the Companies "admit[ted]" that Beehive was the entity that actually provided AT&T with interconnection services. *Id.*

The Companies filed a timely petition for review.

## II

We will "uphold the Commission's decision unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Achernar Broadcasting Co. v. FCC*, 62 F.3d 1441, 1445 (D.C. Cir. 1995) (quoting 5 U.S.C. § 706(2)(A)); *see* 47 U.S.C. § 402(g) (providing for review of FCC orders "in the manner prescribed by section 706 of Title 5"). An order from the Commission that exceeds the scope of its statutory authority is, by definition, not in accordance with the law and subject to vacatur. *See, e.g.*, *American Library Ass'n v. FCC*, 406 F.3d 689, 708 (D.C. Cir. 2005).

We hold that the Commission's damages award was lawful, but that those portions of the Commission's decision touching on the merits of the Companies' state-law claims are without legal effect.

## A

The Companies' opening salvo is jurisdictional. Specifically, they contend that, because the Commission's *Liability Order* found them to be sham entities rather than genuine common carriers, the Commission's jurisdiction over them evaporated, leaving it powerless to award damages. The Companies cannot wiggle out of responsibility for their violations of the Communications Act that easily.

The Commission has jurisdiction over complaints alleging "anything done or omitted to be done by any common carrier * * * in contravention of the provisions" of the Communications Act. 47 U.S.C. § 208(a). Thus, for "common carriers," taking actions that run afoul of the Communications Act does not get them out from under the Commission's authority.

A "common carrier," in turn, is "any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio." 47 U.S.C. § 153(11). To "engage" someone in the business context is to hire or secure the services of that entity. 3 OXFORD ENGLISH DICTIONARY 173–174 (def. 5a) (1933) (reprint 1978) (defining "engage" as "[t]o hire, secure the services of (a servant, workman, agent, etc.)" and "[t]o enter into an agreement for service").[3] Thus, at the very least, a "common carrier" includes entities providing services pursuant to a tariff—an agreement—filed with the Commission, even if the tariffs are subsequently determined to be invalid.

In addition, in deciding whether the Companies are "common carriers," we look to the common law meaning of that phrase. *See, e.g.*, *National Ass'n of Regulatory Util. Comm'rs v. FCC* ("*NARUC*"), 525 F.2d 630, 640–642 (D.C. Cir. 1976) (turning to the common law to interpret the statutory definition of common carrier); *see also Cellco P'ship v. FCC*, 700 F.3d 534, 545–546 (D.C. Cir. 2012).

---

[3] *See also* WEBSTER'S NEW INTERNATIONAL DICTIONARY 847 (transitive def. 8; intransitive def. 2) (2d ed. 1934) (defining "engage" as "[t]o secure or bespeak the services of (a person); to hire; enlist" and "[t]o embark in a business; * * * to employ or involve oneself").

Importantly, under the common law, "one may be a common carrier by holding oneself out as such[.]" *NARUC*, 525 F.2d at 643. As this Court has recognized, the "primary *sine qua non* of common carrier status is a quasi-public character," which arises out of the "undertaking 'to carry for all people indifferently[.]'" *National Ass'n of Regulatory Util. Comm'rs v. FCC*, 533 F.2d 601, 608 (D.C. Cir. 1976) (italics added); *see also Verizon v. FCC*, 740 F.3d 623, 651 (D.C. Cir. 2014) ("[T]he basic characteristic that distinguishes common carriers from 'private' carriers" is the "common law requirement of holding oneself out to serve the public indiscriminately[.]") (citation omitted); *Southwestern Bell Tel. Co. v. FCC*, 19 F.3d 1475, 1481 (D.C. Cir. 1994) ("[T]he indiscriminate *offering of service* on generally applicable terms * * * is the traditional mark of common carrier service.") (emphasis added).

Substantial evidence supports the Commission's determination that the Companies held themselves out to the public, including AT&T, as common carriers for hire. They offered to provide their common-carrier services pursuant to an agreement—a tariff that was filed with the Commission. They also obtained state certificates to operate as common carriers, and they represented in their district court complaint that they were common carriers. Furthermore, the Companies sought to obtain the benefits of common carrier status, such as the protections of the filed-rate doctrine. *See* Oral Argument Tr. at 6:11–13 (Petitioners' Counsel: "[W]e sought the benefits of being a common carrier, the benefit of being able to file a tariff, to collect regulated access fees under that tariff, and [to] us[e] the filed rate doctrine[.]"). Indeed, an important predicate for the Companies' district court action is that AT&T accepted access services and the Companies billed AT&T for those services pursuant to a tariff filed with the Commission, albeit one later found to be invalid.

Notably, in *Farmers*, *supra*, we rejected a similar jurisdictional argument as "flatly wrong." 668 F.3d at 719. There, the defendant company Farmers, as part of a traffic-pumping scheme, had "held itself out as a common carrier providing access service" to interexchange carriers, and billed for that service pursuant to a tariff. *Id.* We held that the Commission's ruling that Farmers had violated the Communications Act by improperly charging for its services "could not immunize [Farmers] from the complaint process." *Id.*

Likewise here, having held themselves out as common carriers and having charged AT&T for services under a common-carrier tariff, the Companies were "engaged as a common carrier for hire," 47 U.S.C. § 153(11), and thus were subject to the Commission's jurisdiction. They cannot now wield their violation of the Communications Act as a shield against remedial liability for that same wrongdoing.

**B**

Turning to the merits, we hold that the Commission's damages award was permissible. The Commission's conclusion that the Companies did not render any service to AT&T chargeable under the Communications Act is supported by substantial evidence in the record. *Damages Order*, 30 FCC Rcd. at 8962 ¶¶ 11, 13.

To begin with, the Companies themselves repeatedly conceded that Beehive, not they, provided the access services that AT&T received. *See, e.g.*, Answer and Affirmative Defenses ¶ 3, *AT&T Corp. v. All American Tel. Co.*, File No. EB-09-MD-010 (FCC filed Dec. 1, 2014) ("Nevertheless, [the Companies] admit that they billed AT&T for Local Switching

service that was provided by Beehive[.]"); *id.* ¶ 57 ("[The Companies] admit that Beehive carried all traffic relevant to the case at bar, and was responsible for the routing and termination of the calls that AT&T's customers made to chat and conference service providers."); *id.* ¶ 59 ("[The Companies] admit that all of the traffic at issue was routed from AT&T to its point of termination in Beehive's facilities by Beehive.").

In addition, the Companies stipulated that the amount of the award—$252,496.37—was the amount that AT&T had paid to the Companies for access services. *Damages Order*, 30 FCC Rcd. at 8962 ¶ 11.

Finally, the Commission reasonably concluded that the Companies were obligated to reimburse AT&T the amount that AT&T paid to them for what turned out to be no qualifying access service. There is nothing arbitrary or capricious about the Commission's decision that paying something for nothing that is properly chargeable under the Communications Act is a compensable harm.

The Companies argue that the proper measure of damages should have been AT&T's actual pecuniary loss, not the rate they paid. They contend specifically that AT&T failed to prove that it suffered an actual pecuniary loss because it received a connection service and, whether rendered by Beehive or the Companies, AT&T owed the same amount of money either way. Paying the Companies rather than Beehive directly thus took nothing extra out of AT&T's pockets.

The Companies are correct that AT&T bore the burden of showing both a violation of the law and "actual damages suffered as a consequence of such violation." *New Valley Corp. v. Pacific Bell*, 15 FCC Rcd. 5128, 5134 ¶ 14 (2000); *see*

*also Communications Satellite Corp.*, 97 F.C.C.2d 82, 91 ¶ 26 (1984) ("It is also well established that in a complaint proceeding, the complainant has the burden of proving both *the fact and the amount* of damages[.]").

But *New Valley* and *Communications Satellite* stand only for the proposition that the party seeking damages must prove a financial loss that was caused by the alleged violation. *See New Valley*, 15 FCC Rcd. at 5133 ¶ 12 (party had not proven how the defendant's failure to file tariff charges for services actually rendered had caused any injury); *Communications Satellite*, 87 F.C.C.2d at 92 ¶ 30 (party failed to show how its failure to win a Department of Defense bid was the proximate cause of any loss of profits).

AT&T met that burden. AT&T presented expert declarations evidencing the amount of money it paid the Companies for no actual access service authorized by the Communications Act, and the parties ultimately stipulated to that measure of damages. In addition, unlike *New Valley* and *Communications Satellite*, AT&T causally linked its damages to the Companies' traffic-pumping scheme, showing that, in the eyes of the Communications Act, they were sham entities that rendered no chargeable access services to AT&T.

The Companies' actual-loss argument, at bottom, reduces to the claim that its liability should be excused because AT&T might have owed Beehive those same access charges. The Commission, however, permissibly held the Companies financially responsible for the payments they received as a result of their own conduct. *See Damages Order*, 30 FCC Rcd. at 8958 ¶ 1 ("Because Defendants may charge only for services they actually provide, it would be unjust to allow them to retain the amounts AT&T paid.").

**C**

Finally, the Companies contend that the Commission improperly analyzed the merits of their state-law *quantum meruit* claims, which include a claim of unjust enrichment. Those state common law claims fall outside the Commission's wheelhouse, and are still pending before the district court. We agree that a few aspects of the Commission's decision have strayed beyond its authority, and hold that those portions are invalid to the extent that they speak to the merits of the Companies' state-law claims.

The controverted language in the Commission's liability order appears in two places. First, in responding to the Companies' assertion of an unjust enrichment defense to AT&T's damages claim, the Commission explained that the Companies had failed to show "that they may plead equitable defenses in a Section 208 complaint proceeding," *Damages Order*, 30 FCC Rcd. at 8963 ¶ 13. Fair enough. The problem is that the Commission went on to say that, "[e]ven assuming" such a common-law claim could be decided by the Commission, the Companies' unjust enrichment claim is without merit because the Companies had "failed to establish the necessary elements for unjust enrichment, because they did not provide a service to, or confer a benefit on, AT&T." *Id.*

Second, at the end of its decision, the Commission dismissed the remaining referred issues as moot—which included the *quantum meruit* claims, *see* Referral Order, *supra*, at Ex. A, ¶ 2—because the Companies "did not provide any service to AT&T." *Damages Order*, 30 FCC Rcd. at 8966 ¶ 21.

**1**

Before proceeding to the merits of the Companies' challenge to those aspects of the Commission's decision, we must first address the Commission's threshold challenges to our ability to decide that question.

*First*, the Commission argues that the Companies lack standing to raise these arguments because the Commission's statements do not injure them. The Commission contends that the Companies will not be harmed by the decisional language unless the district court gives effect to it in its own proceedings.

To establish standing, the Companies must demonstrate either actual injury from the Commission's ruling, a "certainly impending" injury, or "substantial risk" of such an injury. *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014). To have standing, then, the Companies must demonstrate a substantial risk that the district court will credit the Commission's determinations in resolving the Companies' common law claims. In this rather unique context, such a substantial risk of injury to the Companies exists because, going forward, the district court will be powerless to set aside any erroneous Commission determinations pertaining to their state-law claims. That is because the Hobbs Act vests exclusive jurisdiction to review final decisions of the Commission in the federal courts of appeals, not the district courts. 28 U.S.C. § 2342(1); *see also FCC v. ITT World Communications, Inc.*, 466 U.S. 463, 468 (1984) ("Exclusive jurisdiction for review of final [Commission] orders * * * lies in the Court of Appeals."). Litigants "may not evade these provisions by requesting the District Court to enjoin action that is the outcome of the agency's order," even if the agency order is allegedly *ultra vires*. *ITT World Communications*, 466 U.S. at 468.

As a consequence, once the primary jurisdiction referral is completed, the Companies will be powerless to challenge the merits of the Commission's decision before the district court, and the district court will be "without authority to review the merits of the [Commission's] decision." *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 69 (1970).

Given that, the Companies face a substantial risk that the district court would take the Commission's statements at face value and hold that the common law unjust enrichment claim is foreclosed. Because the Companies have no other avenue to challenge that asserted overreach by the Commission, they have standing to pursue that claim here.

*Second*, the Commission insists that the Companies' argument is foreclosed because they failed to file a petition for reconsideration raising their objection to the Commission addressing their common law claims. The filing of a petition for reconsideration is a "condition precedent to judicial review" whenever a party "relies on questions of fact or law upon which the Commission * * * has been afforded no opportunity to pass." 47 U.S.C. § 405(a). Accordingly, those who wish to challenge a Commission decision must ensure that the Commission is afforded "a fair opportunity to review the arguments" before raising them in court. *BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1183 (D.C. Cir. 2003).

We do not, however, require that the issue be raised with "[a]bsolute precision," and "judicial review is permitted so long as 'the issue is necessarily implicated by the argument made to the Commission.'" *EchoStar Satellite LLC v. FCC*, 704 F.3d 992, 996 (D.C. Cir. 2013) (quoting *Time Warner Entm't Co. v. FCC*, 144 F.3d 75, 80 (D.C. Cir. 1998)); *see also*

*Sprint Nextel Corp. v. FCC*, 524 F.3d 253, 257 (D.C. Cir. 2008) ("The pith of the test is this: 'the argument made to the Commission' must 'necessarily implicate[]' the argument made to us.") (alteration in original; citation omitted).

Here, the Companies (as well as AT&T) repeatedly argued to the Commission that it lacked the authority to address the state-law claims. The Companies pointed out that "the possible merits of their equitable claims" were "not before the Commission in the instant proceeding, as AT&T admits in footnote 87, and so are irrelevant." Answer and Affirmative Defenses, *supra*, ¶ 78. Doubling down, the Companies added that "the Commission lacks authority to hear [their] claims for damages against AT&T, as a non-carrier," and that "[t]o the extent AT&T has arguments for the SDNY court, it should make them there, and not in this proceeding." *Id.* ¶ 88.

AT&T agreed. *See* Supplemental Complaint of AT&T Corp. for Damages ¶ 77 n.87, *AT&T v. All American Tel. Co.*, File No. EB-09-MD-010 (FCC filed Oct. 24, 2014) ("[T]he Commission does not generally have jurisdiction to address the merits of any particular state law quasi-contract claim[.]"); Reply Legal Analysis in Support of Supplemental Complaint at 33, *AT&T Corp. v. All American Tel. Co.*, File No. EB-09-MD-010 (FCC filed Dec. 22, 2014) ("[T]he Commission should not decide the merits of any state law claim[.]"); *see also Bartholdi Cable Co. v. FCC*, 114 F.3d 274, 280 (D.C. Cir. 1997) ("[Section] 405 does not require that the party seeking judicial review of an issue be the party that provided the Commission with opportunity to pass on the issue.").

Because the Commission was afforded a full and fair opportunity to consider its treatment of the state-law claims and was fully apprised of the Companies' position, Section 405(a) is no bar to reaching the merits. *See, e.g.*, *Sorenson*

*Communications, Inc. v. FCC*, 765 F.3d 37, 50 (D.C. Cir. 2014) (issue is ripe for review when "the Commission had an 'opportunity to pass' upon the question of fact or law raised in the petition" even if no petition for reconsideration was filed) (citation omitted).[4]

**2**

The Companies are correct that the Commission lacked the legal authority to discuss the merits of their state-law *quantum meruit* claims. Congress has vested the Commission only with the authority to address allegations of actions taken "in contravention of" the Communications Act. 47 U.S.C. § 208(a). A state common law claim, by definition, does not arise under or state a violation of the Communications Act, and thus falls outside the scope of the Commission's jurisdiction.

In addition, the Companies' state-law claims seek to determine the rights of a carrier against a customer: the Companies want the district court to order AT&T to pay them for services allegedly rendered. But for more than half a century, the Commission has held that it lacks jurisdiction to "determin[e] * * * the carrier's rights against a subscriber[.]" *Thornell Barnes Co. v. Illinois Bell Tel. Co.*, 1 F.C.C.2d 1247, 1275 (1965); *see also AT&T Corp. v. Bell Atl.-Pa.*, 14 FCC

---

[4] Prior decisions of this court have held that Section 405(a) "constitutes 'an exhaustion requirement, rather than * * * a jurisdictional prerequisite.'" *M2Z Networks, Inc. v. FCC*, 558 F.3d 554, 558 (D.C. Cir. 2009) (citation omitted; alteration in original); *see also Southern Indiana Broadcasting, Ltd. v. FCC*, 935 F.2d 1340, 1342 (D.C. Cir. 1991) ("[W]e have treated this as an 'exhaustion' requirement, rather than a jurisdictional prerequisite, and have allowed exceptions[.]"). In any event, for the reasons given, the briefing by both the Companies and AT&T fairly presented the issue to the Commission.

Rcd. 556, 599 n.240 (1998) (the Commission has "no authority" to conduct "adjudications of carrier's rights against their customers"). Indeed, the Commission here dismissed the Companies' complaint against AT&T for that very reason. *All American Tel. Co.*, 26 FCC Rcd. at 726 ¶ 10. And we have previously affirmed and enforced this limitation on the Commission's jurisdiction. *See MCI Telecomms. Corp. v. FCC*, 59 F.3d 1407, 1417 (D.C. Cir. 1995) (vacating portion of a Commission order that "involve[d] a determination of the carrier's rights against a [customer], over which this Commission has no jurisdiction") (second alteration in original) (quoting *Thornell Barnes Co.*, 1 F.C.C.2d at 1275 ¶ 67).

Accordingly, the Commission's discussion of the Companies' ability to satisfy the "necessary elements for unjust enrichment," *Damages Order*, 30 FCC Rcd. at 8963 ¶ 13, and its determination that the *quantum meruit* claims referred to the Commission were "moot[ed]" by the Commission's decision that the Companies "did not provide any service to AT&T," *id.* at 8966 ¶ 21, were improper and *ultra vires* to the extent that they addressed the Companies' state-law claims. The Companies' petition for review is granted only with respect to those aspects of the decision that reached beyond the Commission's statutory authority. The merits of the Companies' state-law claims must be decided by the district court in the first instance.[5]

\* \* \*

---

[5] Because the Commission's order does not reach the question of whether the Communications Act preempts the Companies' state-law claims, that question also remains open for the district court to address in the first instance.

The petition for review is granted in part and denied in part.  The Commission's award of damages is affirmed, but insofar as the Commission reached and decided any questions of state law or the merits of the Companies' *quantum meruit* claims, those parts of the decision are without legal effect and vacated in relevant part.

*So ordered.*