# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 4, 2021            Decided July 9, 2021

No. 19-1233

GREAT LAKES COMMUNICATION CORP., ET AL.,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

AT&T CORP., ET AL.,
INTERVENORS

———

Consolidated with 19-1244

———

On Petitions for Review of an Order
of the Federal Communications Commission

———

*Lauren J. Coppola* argued the cause for petitioners. With her on the joint briefs were *G. David Carter*, *Dwayne D. Sam*, *Anthony T. Caso*, *John C. Eastman*, *Henry Goldberg*, and *W. Kenneth Ferree*. *Robert Callahan* entered an appearance.

*James M. Carr*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Michael F. Murray*, Deputy Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *Andrew N. Delaney*, Attorneys, *Thomas M. Johnson, Jr.*, General Counsel, Federal Communications Commission, *Ashley S. Boizelle*, Deputy General Counsel*,* and *Richard K. Welch*, Deputy Associate General Counsel. *Jacob M. Lewis*, Associate General Counsel, and *Matthew J. Dunne*, Counsel, Federal Communications Commission, entered an appearance.

*Timothy J. Simeone*, *Deepika H. Ravi*, *Michael J. Hunseder*, *James P. Young*, *Christopher M. Heimann,* and *David L. Lawson* were on the joint brief of intervenors AT&T Corp., et al. in support of respondents. *C. Frederick Beckner III*, *Jonathan E. Nuechterlein*, and *Christopher J. Wright* entered appearances.

Before: WILKINS and RAO, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge.*

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*: Petitioners challenge an FCC rule that discourages competitive carriers from stimulating access fees that long-distance carriers must pay when routing calls to a local carrier. We deny the petitions because the Commission has ample statutory authority and its rule is reasonable.

## I

As we previously described, so-called "competitive carriers" compete with legacy "incumbent carriers," who are

descendants of AT&T's broken-up monopoly. *See generally Comptel v. FCC*, 978 F.3d 1325 (D.C. Cir. 2020). Typically, the latter own the local phone network, while the former lease or purchase at wholesale the use of the incumbent's network to deliver services.

The smaller of the incumbent carriers—operating largely in rural areas—are known as rate-of-return carriers because their prices are set by a regulatory formula based on their costs plus a profit percentage. Competitive carriers benchmark their rates to an incumbent operating in the same area, whose rates have already been approved. *See Connect America Fund*, Notice of Proposed Rulemaking, 26 FCC Rcd. 4569 ¶ 36 (2011). Since competitive carriers use the networks of others, they have greater geographic flexibility. And this flexibility allows them to act quickly to exploit profitable market opportunities and engage in regulatory arbitrage.

In a previous case, we described the competitive carriers' targeting of a market niche servicing large business and government entities. *Comptel,* 978 F.3d at 1331. In this case, the FCC focuses on the competitive carriers' pursuit of another market segment—toll conference centers. They host telephone conferences where multiple people call in to a meeting.

Servicing toll conference centers has been a particularly lucrative business for competitive carriers. Under existing (and congressionally-sanctioned) regulations, long-distance carriers must pay an "access fee" to local carriers that deliver calls to their recipients. The access fee covers the responsibility of tandem switching and transportation to the local carrier's end office. The more people who call into the conference center, the more profit the carrier generates, because fees exceed the marginal cost to the carrier. This provides a competitive carrier an incentive to operate in areas where the incumbents have high

per-minute interstate access rates, and then to inflate the amount of traffic on its system.

Calls to rural areas are more expensive (and profitable) for technological and regulatory reasons. So competitive carriers will often route calls through rural areas and encourage toll conference centers to operate there. Indeed, some carriers operating in rural areas have had explicit agreements with call centers to share revenue from access charges—thereby stimulating conference callers to offer artificially low rates (even totally free calls).

As a result of these incentives, some sparsely populated rural areas receive a disproportionate and overwhelming number of calls. The Commission credited AT&T's observation, for instance, that twice as many calling minutes were routed in a month to Redfield, South Dakota (population 2,300) and one end office as were routed to Verizon's facilities in New York City (population 8,500,000) and 90 end offices. Similarly, Sprint explained that Iowa, with 1% of the U.S. population, accounts for 48% of Sprint's access fee payments. In addition to higher fees, the Commission notes that access stimulation may result in overloaded networks, call blocking, and dropped calls. *Updating the Intercarrier Compensation Regime to Eliminate Access Arbitrage*, 34 FCC Rcd. 9035 ¶¶ 15, 95, 111 (2019) ("*Order*").

The long-distance carriers complained to the FCC. Under existing rules they could not charge their customers separately for such calls; long-distance rates for customers are calculated as flat rates without regard to the length of call or geographic distance. *See* 47 U.S.C. § 254(g); *Connect America Fund*, Report and Order, 26 FCC Rcd. 17663 ¶ 663 ("*2011 Order*"). The interexchange carriers claimed, therefore, that the costs

generated by the few who were making these calls to conference centers were borne by all customers.

In a 2011 rule, the FCC agreed with the long-distance carriers' complaints. *2011 Order* ¶ 675. The FCC designated carriers who exploited this regulatory loophole as "access stimulators." That designation included both competitive carriers and rate-of-return carriers who (1) had a revenue sharing agreement with a third-party based on access charges and (2) had three times as many long-distance calls coming in ("terminating") as going out ("originating").[1] If designated an access stimulator, regulators would reduce the access fees that a carrier was permitted to charge. *2011 Order* ¶¶ 684–86, 688–90.[2]

But the 2011 rule was not completely successful. Some competitive carriers continued to stimulate access fees notwithstanding the sanction. Others successfully circumvented the ban on direct revenue sharing with the conference call centers by using third parties. *See Order* ¶ 44; *AT&T Corp. v. FCC*, 970 F.3d 344, 351–53 (D.C. Cir. 2020).

So, in 2018, the Commission revisited the problem. It issued a Notice of Proposed Rulemaking that, importantly, inquired "whether, and if so how, to revise the current definition of access stimulation to more accurately and

---

[1] Even if a carrier didn't meet the 3:1 ratio, it could still be an access stimulator if it had doubled either its interstate originating or terminating switched access minutes in a month, year over year.

[2] Certain carriers challenged the 2011 rule in the Tenth Circuit, which sided with the Commission. *See generally In re FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014).

effectively target harmful access stimulation practices."[3] The prospective sanction for a carrier determined to be an access stimulator was a complete ban on charging access fees.

The FCC released a draft order in which it stated that it would add an alternative definition of access stimulation that would not include the troubling revenue sharing agreement as an essential element. Instead, competitive—as well as rate-of-return—carriers that terminated six times the number of long-distance calls they originate would be access stimulators, even if there was no revenue sharing agreement.

After the close of the comment period, AT&T and NTCA (a trade association including rate-of-return carriers) met with the FCC and claimed that rate-of-return carriers did not engage in harmful access stimulation practices, but some would nevertheless hit the 6:1 ratio. They proposed a higher ratio— 10:1—for rate-of-return carriers. That same day, the FCC released a notice of its final agenda, thereby, under the Commission's rules, preventing further responses.

The Commission adopted rules largely following those proposed in the draft order but incorporating the differentiated definitions proposed by AT&T and NTCA. In addition to the old definition of access stimulation, the Commission added a new factor. If a competitive carrier exceeded a 6:1 ratio of terminating to long-distance calls in any month, it would be labelled an access stimulator regardless of whether it had any revenue sharing agreements. *Order* ¶¶ 43–67. But rate-of-return carriers without a revenue sharing agreement could

---

[3] Notice of Proposed Rulemaking, 33 FCC Rcd. 5466, 5475 ¶ 26 (2018) ("*NPRM*").

avoid access-stimulator status if their ratio did not exceed 10:1 for three consecutive months.[4]

The Commission explained its separate test for rate-of-return carriers by emphasizing their structural and economic differences from competitive carriers. *Id.* ¶¶ 47–55. As we previously described, the Commission noted that many rate-of-return carriers are small and rural. They have fixed offices and infrastructure serving defined communities. By contrast, many competitive carriers serve only high-volume commercial customers and can flexibly target those customers. *Id.* ¶ 49. And the Commission found that rate-of-return carriers may be more susceptible to seasonal fluctuations given the economics of rural communities. These considerations, coupled with the lack of evidence that rate-of-return carriers were engaging in harmful access-stimulation practices, led the Commission to adopt the separate definitions of access stimulation.

The *Order* prohibited an access stimulator from collecting access charges from long-distance carriers. Moreover, it also imposed responsibility on access stimulators for paying any access charges imposed by intermediate carriers (carriers between the long-distance carrier and the access-stimulating network). *Order* ¶¶ 17–42. The agency explained this rule would "properly align financial incentives by making the access-stimulating [carrier] responsible for paying for the part of the call path that it dictates." *Order* ¶ 17.

---

[4] Rate-of-return carriers also had to be of sufficient size to trigger the 10:1 ratio definition—at least 500,000 minutes of interstate terminating traffic in an end office, averaged over three calendar months. *Order* ¶ 43.

## II

Petitioners (several competitive carriers and companies that offer conference calls) challenge the rule on three grounds. First, they contend that it exceeds the Commission's statutory authority. Second—and this is the main substantive argument—the rule is arbitrary and capricious (unreasonable) for several reasons. Third, there is a separate violation of the APA; the rule is not a logical outgrowth of the Notice of Proposed Rulemaking. We take these arguments in turn.

## A

The government relies primarily on 47 U.S.C. § 201(b) for its authority to promulgate the *Order*. That section provides:

> All charges, practices, classifications, and regulations for and in connection with [common carrier] communication service, shall be *just and reasonable*, . . . The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.

(emphasis added). On its face, Section 201(b) gives the Commission broad authority to define and prohibit practices or charges that it determines unreasonable. Fees intentionally accrued by artificially stimulating and inefficiently routing calls would appear to fall within that wide authority. To be sure, under the APA, the Commission's decisions as to what is unreasonable must themselves be reasonable. But if the Commission can legitimately conclude that local carriers' behavior as an access stimulator is unfair to the long-distance carriers and their customers—which we discuss in part B— then the local carriers who engage in access stimulation can

reasonably be described as engaging in unreasonable practices under Section 201(b).

Petitioners respond by claiming that the statutory text in Section 201(b) is not as broad as it seems because other provisions cabin the Commission's authority. It is claimed that Section 251(b)(5), which obliges carriers to establish *reciprocal* arrangements to transport and terminate calls, and Section 252(d)(2), which links reciprocity with just and reasonable agreements, are inconsistent with the remedy the *Order* applies to an access stimulator.

> 47 U.S.C. § 251(b): Each local exchange carrier has the following duties: . . . (5) The duty to establish *reciprocal* compensation arrangements for the transport and termination of telecommunications.

> 47 U.S.C. § 252(d)(2): (A) For the purposes of compliance by an incumbent local exchange carrier with section 251(b)(5) of this title, *a State commission* shall not consider the terms and conditions for reciprocal compensation to be *just and reasonable* unless—(i) such terms and conditions provide for *the mutual and reciprocal recovery by each carrier of costs* associated with the transport and termination on each carrier's network facilities . . . .

> (B) This paragraph shall not be construed—(i) to preclude arrangements that afford the mutual recovery of costs through the offsetting of reciprocal obligations, including arrangements that waive mutual recovery (such as bill-and-keep arrangements).

(emphases added).

Petitioners contend that the reciprocity and mutuality requirements of 251(b)(5) and 252(d)(2) should inform the reading of 201(b)'s "just and reasonable" term. But, as the Commission points out, neither 251(b)(5) or 252(d)(2) applies directly to the FCC. They are directed to carriers and State Commissions respectively, and the Commission's role is limited to supplying background default rules for States to apply. *See Order* ¶ 99 (citing *2011 Order* ¶¶ 760–81); *see also* 47 U.S.C. § 201(b) (granting rulemaking authority).

There is no dispute between the parties that the linguistic meaning of "just and reasonable," standing alone, would give the Commission broad authority. *See Nat'l Ass'n of Regul. Util. Comm'rs v. ICC*, 41 F.3d 721, 726–27 (D.C. Cir. 1994). But, arguably, the *Chevron* framework is still in play to determine whether Sections 251 and 252 affect the meaning of "just and reasonable" in this context. The government invoked *Chevron*, and we think its interpretation is eminently permissible. *See* 467 U.S. 837 (1984).

Even assuming the sections did limit the Commission's authority under 201(b), Petitioners' argument has no merit. They argue the sanction imposed on access stimulators is itself non-reciprocal and non-mutual because they can no longer recover access charges for calls they terminate—a circumstance which doesn't apply to calls the access stimulator originates. This seems to us to be a rather labored and unpersuasive argument. Under Petitioners' logic, if a local carrier's ratio of incoming calls to outgoing were 100:1, the Commission would be powerless to prevent the access stimulator from recovering access fees despite being grossly disproportionate to its costs. And after all, the whole purpose of the FCC's rule is to achieve a measure of reciprocity

between the originating and terminating calls, and thereby reciprocity with the interexchange carriers.[5]

In sum, we think Petitioners' statutory arguments are unpersuasive.

**B**

Petitioners attack the premise of the FCC's rule. It is allegedly unreasonable for the FCC to conclude that consumers were disadvantaged by the stimulation of access charges.[6] Seventy-five million people use toll conferencing annually. And the revenue long-distance carriers receive from these subscribers—some $20.7 billion—dwarfs the $60–80 million in additional charges caused by access stimulators.

The flaw in the argument is that, as the Commission explained, it is impossible for the long-distance carriers to charge those users the marginal cost for these services. Section 254(g) of the Communications Act prevents them from charging customers directly for these costs. Since the costs are thus spread to all consumers, access stimulation raises the cost of calls for everyone. *See Order* ¶ 20 n.55 (citing *2011 Order* ¶ 663).

---

[5] This whole question of access stimulation will probably become moot as the Commission fully transitions to what is called a bill-and-keep regime, whereby access fees will be largely or entirely eliminated and each carrier will bill its customers for its cost of originating and terminating calls. *See Order* ¶ 11; 47 U.S.C. § 251(g) (providing the Commission authority to establish transitory rules).

[6] *See* 5 U.S.C. § 706(2)(A); *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) (requiring agency action be "reasonable and reasonably explained").

Still, Petitioners challenge the notion that even though the costs for long-distance carriers had been reduced by the 2011 rule—and reduced further by the 2019 rule—these cost savings would flow to consumers. They have, according to Petitioners, fattened the purses of the long-distance carriers' stockholders, not callers. To support this theory, Petitioners sought discovery into whether the 2011 rule had actually benefitted consumers. They contend that the Commission's refusal to pursue evidence to establish their premise was erroneous and, substantively, the premise itself was unreasonable.

We disagree. The Commission was well within its broad discretion to "decide when enough data is enough." *United States v. FCC*, 652 F.2d 72, 90–91 (D.C. Cir. 1980) (en banc). And it could reasonably rely on common sense and predictive judgments within its expertise "even if not explicitly backed by information in the record." *Phoenix Herpetological Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*, 998 F.3d 999, 1006 (D.C. Cir. 2021); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 521 (2009).

In any event, the requested evidentiary exploration would have been a snare and a delusion. It is well established the interexchange market is quite competitive, as the Commission explains. *Order* ¶ 32. In a competitive market, a reduction in producer costs can reasonably be expected to translate into lower consumer prices. Moreover, as the Commission further explained, even if some portion of the cost savings improved the returns of shareholders, that would benefit the public in the long run by encouraging further investment in long-distance networks.

Petitioners further contend that even large and expensive charges should be tolerated provided that the long-distance carriers are able to make a profit. This argument is based on a

rather disappointing understanding of economics. The relevant point is that artificial network stimulation harms consumers by distorting the market.

\* \* \*

Next we deal with Petitioners' claim that it was unfair, and thus unreasonable, to treat the rate-of-return carriers more leniently than the competitive carriers. It will be recalled that the rate-of-return carriers are not deemed access stimulators unless they have incoming calls which exceed a ratio of 10:1 vis-à-vis outgoing calls, but competitive carriers are subject to a 6:1 ratio.[7]

The Commission "bears the burden 'to provide some reasonable justification for any adverse treatment relative to similarly situated competitors.'" *Baltimore Gas & Elec. Co. v. FERC*, 954 F.3d 279, 283–84 (D.C. Cir. 2020) (quoting *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1025 (D.C. Cir. 2018)). We think the Commission satisfied this burden and reasonably distinguished the two kinds of carriers. The rate-of-return carriers lack the same ability to pursue conference call centers as customers and game the access charge regime. They have a relatively defined geographic footprint that prevents the aggressive selling practices and rate arbitrage that competitive carriers can employ.

---

[7] Petitioners also claim the 6:1 ratio is arbitrary. In a sense that is true, just as would be true of a 60 miles-per-hour speed limit. But it is within the zone of reasonableness given the Commission's goal to set a ratio that would encompass carriers engaged in access stimulating practices without relying on a revenue sharing agreement. *See Vonage Holdings Corp. v. FCC*, 489 F.3d 1232, 1242–43 (D.C. Cir. 2007).

To be sure, some competitive carriers have gravitated to state-of-the-art network facilities, affixing them more firmly to a geographic area and allowing them to pursue both business and residential customers. But as a class, it is still true that most competitive carriers are much more flexible than rate-of-return carriers. Therefore, the FCC's differential treatment of the two types of carriers was reasonable.

Indeed, the Commission saw no evidence that rate-of-return carriers had sought to stimulate their access charges or engage in rate arbitrage. Yet the increasing use of the internet and cell phones to initiate long-distance calls could cause rate-of-return carriers' ratio of incoming-to-outgoing calls to rise above 6:1. So the 10:1 limitation imposed on them by the Commission's *Order* was a reasonable prophylactic limitation.

\* \* \*

Petitioners argue that the Commission's subsequent enforcement of the rule and grant of waivers demonstrates the *Order*'s arbitrariness, and, specifically, evidence the Commission's targeting of certain competitive carriers. The FCC responds that such arguments are improperly before this Court. We side with the Commission.

Ordinarily we review only the order or rule before us, not subsequent events. *Comptel*, 978 F.3d at 1334. However, Petitioners call our attention to an exception, *Amoco Oil Co. v. EPA*, 501 F.2d 722 (D.C. Cir. 1974). The peculiar circumstances of that case led us to consider post-rulemaking events for the limited purpose of assessing "the truth or falsity of agency predictions." *Id.* at 729 n.10. We considered post-rulemaking congressional testimony that bore directly on the plausibility of agency predictions that were essential to the rule—and predictions the agency reaffirmed subsequent to the rule. *Id.* at 729 n.10, 731.

15

As we later emphasized, "[t]he exception made in *Amoco Oil* was quite narrow." *Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 920 (D.C. Cir. 2008). It does not apply here, and we certainly do not wish to extend it. If Petitioners want to challenge the Commission's enforcement practices it will have to do so in a separate proceeding.[8]

## C

There remains Petitioners' argument that the final rules' differential treatment of rate-of-return carriers and competitive carriers—even if reasonable—was not foreshadowed by the *NPRM*; it was not a "logical outgrowth" of the Notice. *See U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 700 (D.C. Cir. 2016) (A notice "satisfies the logical outgrowth test if it expressly ask[s] for comments on a particular issue or otherwise ma[kes] clear that the agency [is] contemplating a particular change." (internal quotation omitted)); 5 U.S.C. § 553(b)(3) ("The notice shall include . . . (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.").

This is a troubling argument, perhaps because the Commission accepted the last-minute proposal from AT&T and NTCA—too late for adverse comment. Even though we have concluded that the FCC's adoption of the proposal was

---

[8] Petitioners also raise a rather weak argument that the *Order* creates a Network Edge inconsistently with past policy. *See Fox Television Stations*, 556 U.S. at 515. A Network Edge is the boundary in a bill-and-keep system where the financial responsibility shifts between carriers. Petitioners' argument is not worth discussing because, as reasonably construed by the Commission, the *Order* does not set a Network Edge, as it does not yet institute a bill-and-keep regime. *See Order* ¶ 101.

reasonable, can it fairly be said that the differential treatment was a logical outgrowth of the notice?

The FCC's position is clearly yes because the *NPRM* explicitly asked whether the Commission should "modify the ratios or triggers"—plural—in the definition of access stimulation (recall it is 3:1 under the 2011 rule). *NPRM* ¶ 26. That statement warned commenters that the prior 3:1 ratio could be modified. Granted, it did not explicitly suggest differential treatment. But since the Commission concluded that rate-of-return carriers were not at all access stimulators—a conclusion that Petitioners do not challenge—it would have been foreseeable that rate-of-return carriers would have been excluded altogether from any modification of the 2011 rule. Because even such an extreme differential treatment was foreseeable, the *Order*'s more limited differential ratios were a logical outgrowth of the notice.[9]

\* \* \*

In sum, Petitioners have not shown that the Commission failed to provide adequate notice or otherwise acted unreasonably in its promulgation of the *Order*. Thus, we deny the petitions for review.[10]

*So ordered.*

---

[9] Petitioners also claim that the remedy to be imposed on access stimulators in the final rule differs from the remedy suggested in the *NPRM*. We think that is obviously of no significance. *See NPRM* ¶¶ 8–9; 13–23; *Order* ¶¶ 40–41.

[10] Petitioners have made a number of other and subsidiary arguments which we have considered and reject without written opinion.