FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WIDE VOICE, LLC,

*Petitioner,*

v.

FEDERAL COMMUNICATIONS
COMMISSION; UNITED STATES
OF AMERICA,

*Respondents,*

AT&T CORP.; AT&T SERVICES,
INC.; MCI COMMUNICATIONS
SERVICES, LLC,

*Respondents-Intervenors.*

No. 21-71375

FCC No.  20-362

OPINION

On Petition for Review of an Order of the
Federal Communications Commission

Argued and Submitted October 18, 2022
Portland, Oregon

Filed March 9, 2023

Before:  Richard A. Paez and Bridget S. Bade, Circuit Judges, and Raner C. Collins,[*] District Judge.

Opinion by Judge Paez

## SUMMARY[**]

### Federal Communications Commission

The panel denied a petition for review of a Federal Communications Commission ("FCC") order finding that Wide Voice, LLC violated § 201(b) of the Communications Act of 1934 by restructuring its business operations to continue imposing charges that were otherwise prohibited by the *Access Arbitrage Order*, 34 FCC Rcd. 9035 (2019).

Access stimulation occurs when telephone companies artificially inflate call traffic connected over their local networks to collect higher fees from long distance carriers.  The FCC issued rules to address this phenomenon, including the *Access Arbitrage Order* that refined the definition of access stimulation and declared that imposing costs on long-distance carriers for access stimulation traffic was unjust and unreasonable under § 201(b).

Wide Voice contended that it complied with, rather than violated, the *Access Arbitrage Order*, and that without an

[*] The Honorable Raner C. Collins, United States District Judge for the District of Arizona, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

explicit rule violation, the FCC did not have the authority to find its conduct "unjust and unreasonable" under § 201(b). The panel held that the FCC properly exercised its authority under § 201(b) to hold Wide Voice liable for circumventing its newly adopted rule in the *Access Arbitrage Order* when the company devised a work around. Contrary to Wide Voice's assertions, the FCC need not establish new rules prohibiting the evasion of its existing rules to find a § 201(b) violation. Further, Wide Voice's contention that courts require a rule violation to find conduct unjust and unreasonable under § 201(b) is unfounded. Finally, the FCC's construction of § 201(b) was reasonable because it was consistent with the agency's longstanding precedent. Under *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), the panel deferred to the agency in holding that the FCC may find a carrier's practice "unjust and unreasonable" without an explicit rule violation.

Wide Voice argued that even if the FCC had the authority to find it liable for a sham arrangement under § 201(b), the FCC's ruling that Wide Voice restructured its business to evade the *Access Arbitrage Order* was unfounded, and therefore, arbitrary and capricious. The panel rejected Wide Voice's specific contentions. First, the panel held that the FCC reasonably determined that Wide Voice, HD Carrier, and Free Conferencing were closely related, non-independent entities. Second, the FCC reasonably determined that Wide Voice, HD Carrier, and Free Conferencing intentionally re-routed traffic to evade the *Access Arbitrage Order*. The panel rejected Wide Voice's contention that it restructured its business to comply with, rather than evade, the FCC's new rules. The panel further held that the FCC reasonably concluded that absent

Wide Voice's workaround, Wide Voice, under its previous business model, would have likely triggered the new rules.

Finally, the panel rejected Wide Voice's contention that even if the FCC was permitted to find its conduct "unjust and unreasonable," it did not have fair notice that its practices were unlawful, and therefore the FCC violated its right to due process. Wide Voice was involved in the rulemaking process that resulted in in the *Access Arbitrage Order*. The panel held that there was no doubt it had sufficient notice as to what behavior complied with the law. The panel did not see any due process violations.

## COUNSEL

Lauren J. Coppola (argued) and Rebecca A. Bact, Robins Kaplan LLP, Boston, Massachusetts, for Petitioner.

William Scher (argued), Counsel; Jacob M. Lewis, Associate General Counsel; Sarah E. Citrin, Deputy Associate General Counsel; P. Michele Ellison, General Counsel; Federal Communications Commission; Washington, D.C.; Robert B. Nicholson and Robert J. Wiggers, Attorneys; Jonathan S. Kanter, Assistant Attorney General; United States Department of Justice, Antitrust Division; Washington, D.C.; for Respondents.

Michael J. Hunseder (argued) and Alice A. Wang, Sidley Austin LLP, Washington, D.C.; Grace W. Knofczynski and Scott H. Angstreich, Kellogg Hansen Todd Figel & Frederick PLLC, Washington, D.C.; Christopher M. Miller and Curtis L. Groves, Verizon, Washington, D.C.; Brett Farley, Christopher M. Heimann, and David L. Lawson, AT&T Services Inc., Washington, D.C.; for Respondents-Intervenors.

## OPINION

PAEZ, Circuit Judge:

The Federal Communications Commission ("FCC") has long monitored local telephone companies' "access stimulation." Access stimulation occurs when such companies artificially inflate call traffic connected over their local networks to collect higher fees from long-distance carriers. In 2011, the FCC issued rules to address this phenomenon, defining when carriers engage in access stimulation and restricting the rates that they could charge. After local carriers found loopholes in this regulatory system, the FCC revisited and updated these rules, issuing the *Updating the Intercarrier Compensation Regime to Eliminate Access Arbitrage* ("*Access Arbitrage Order*"), 34 FCC Rcd. 9035 (2019). The *Access Arbitrage Order* refined the definition of access stimulation and declared that imposing costs on long-distance carriers for access stimulation traffic was "unjust and unreasonable" under § 201(b) of the Communications Act of 1934, 47 U.S.C. § 201 ("§ 201(b)").

In the wake of these new rules, local exchange carrier, Wide Voice, LLC ("Wide Voice"), rearranged its business model and call traffic path in coordination with closely related entities, HD Carrier and Free Conferencing. These changes allowed Wide Voice to continue charging long-distance carriers higher fees without technically breaching the *Access Arbitrage Order*. Long-distance carriers AT&T Corp. and AT&T Services, Inc. (collectively, "AT&T") and MCI Communications Services LLC ("Verizon") filed a complaint with the FCC. The FCC subsequently found that Wide Voice's actions violated § 201(b).

Wide Voice petitions for review of the FCC's order, specifically arguing that the FCC unreasonably concluded that it violated § 201(b) by restructuring its business operations to continue imposing charges that were otherwise prohibited by the *Access Arbitrage Order.*[1]  Wide Voice asserts that the FCC's order should be set aside because (1) the FCC exceeded its statutory authority; (2) the FCC unreasonably deviated from its own legal precedent; (3) the FCC's findings are not supported by substantial evidence; and (4) the FCC's determination violated due process.  We reject Wide Voice's arguments and conclude that the FCC's decision was not arbitrary and capricious, nor unlawful under the Administrative Procedure Act.  Accordingly, we deny the petition for review.

## I.     BACKGROUND

### A.  Regulatory Background

Historically, when a long-distance interexchange carrier ("IXC") transferred a telephone call to a local exchange carrier ("LEC"), the IXC paid per-minute fees, called "access charges," to the LEC**.**  *Wide Voice, LLC v. FCC*, 7 F.4th 796, 798–99 (9th Cir. 2021).  These fees, however, regularly exceeded the cost to the LEC, incentivizing LECs to boost traffic on their networks through artificial means called "access stimulation."  *Great Lakes Commc'n Corp. v. FCC*, 3 F.4th 470, 472 (D.C. Cir. 2021).  LECs originally engaged in access stimulation by entering into revenue sharing agreements with high-volume call service providers (such as conference call lines), which agreed to direct calls to the LECs' local networks with high access rates.  *All Am.*

---

[1] We have jurisdiction under 28 U.S.C. §§ 2342(1), 2344, and 47 U.S.C. § 402(a).

*Tel. Co. v. FCC*, 867 F.3d 81, 85 (D.C. Cir. 2017). These agreements allowed both the LECs and the high-volume call service providers to collect significant profits while IXCs paid the cost. *In the Matter of Connect America Fund*, Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd. 17663, 17874 ¶ 657 (2011). As a result, IXCs were forced to spread expenses to consumers, ultimately raising prices for the general public. *Great Lakes*, 3 F.4th at 476.

In 2011, the FCC targeted access stimulation as part of a comprehensive reform of its intercarrier compensation regime. *See generally Connect America Fund*, 26 FCC Rcd. at 17663, 17874–90 ¶¶ 656–701. In those newly adopted rules, the FCC created a definition for access stimulation, identifying the practice as when an LEC had (1) an "access revenue sharing agreement" with a third party and (2) either had three times more long-distance calls coming in ("terminating") than going out ("originating"), or more than 100 percent growth in monthly call minutes compared to the previous year. *Id.* at 17676 ¶ 33. Under these rules, access stimulating carriers' rates were restricted to undermine any financial incentive to inflate call traffic artificially. *Id.* at 17882–89 ¶¶ 679–98.

To avoid qualifying as an access stimulator under the 2011 rules, some carriers ended their third-party revenue-sharing agreements while others turned to tandem switching. *See Access Arbitrage Order*, 34 FCC Rcd. at 9039 ¶ 11, 9053 ¶ 44. Tandem switching permitted LECs to direct traffic solely between carriers instead of delivering calls to receiving parties ("end users"). *Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 490 (2002). Because the 2011 rules did not regulate tandem switching, IXCs still had to pay high access rates when transferring calls to tandem switching

LECs or "intermediate carriers," which delivered calls to LECs for delivery to end users. *Access Arbitrage Order*, 34 FCC Rcd. at 9039–40 ¶ 12. LECs took advantage of this loophole in the 2011 rules by routing the majority of access stimulation calls to two intermediate carriers in Iowa and South Dakota in order to continue collecting high access rates. *Id*. at 9041–42 ¶¶ 15–16.

In response to these developments, the FCC revisited and revised its access stimulation rules in 2019, releasing the *Access Arbitrage Order*, which addressed the "evolving nature" of access-stimulation. 34 FCC Rcd. 9035 (2019). The *Access Arbitrage Order* provided that requiring IXCs to pay tandem switching charges for access-stimulation traffic was "unjust and unreasonable" in violation of § 201(b). *Id.* at 9073–74 ¶ 92 (citing 47 U.S.C. § 201(b)). To further combat these practices, the new rules prohibited access stimulators from obtaining fees from IXCs and instructed them to recover costs from high-volume calling service providers instead. *Id*. at 9053 ¶ 42. In addition, the FCC required access stimulators to pay the tandem-switching-and-transport charges of their chosen intermediate carriers to ensure that access stimulators were responsible for paying for the part of the call path that they required IXCs to use. *Id*. The FCC also expanded the scope of the rules by changing the definition of access stimulation to include LECs that operated without revenue-sharing agreements if their traffic profile was unbalanced (6:1 terminating to originating minutes). 47 C.F.R. § 61.3(bbb)(1). However, to ensure that innocent intermediate carriers that were placed in access stimulators' call paths were not unfairly penalized, the FCC also limited the definition of access stimulation to carriers that only serve end users. *Id.*; *Access Arbitrage*

*Order*, 34 FCC Rcd. at 9060 ¶ 57; *see also* 47 C.F.R. § 51.914(d).

## B. Factual Background

Wide Voice is a nationwide, facilities-based LEC that offers telecommunications services to its varied customers. Wide Voice was founded in 2010 by Pat Chicas, who served as its first CEO, and David Erickson. In 2014, Andrew Nickerson was hired as president and CEO of the company. However, Erickson remains involved as the settlor of a trust that is the controlling owner of Wide Voice.

Between 2012 to 2019, Wide Voice primarily served end users while also providing tandem services. During that period, Wide Voice mainly terminated calls to high-volume voice applications, including free-to-the-caller conference-calling providers, three of which were also owned and managed by Erickson (collectively "Free Conferencing"[2]).

In 2019, however, Wide Voice rearranged its business model, allegedly to comply with the FCC's new rules and "transition away from the access stimulation business" in response to changes in the market. As a result, Wide Voice stopped connecting calls to end users and began exclusively providing tandem services. Wide Voice continued to carry Free Conferencing's high-volume, free-to-the-caller traffic, but rather than terminating any calls directly to Free Conferencing (and thus serving end users), Wide Voice sent the traffic to a Voice-over-Internet-Protocol provider

---

[2] "Free Conferencing" includes, Free Conferencing Corporation, Carrier X, LLC d/b/a Free Conferencing, and FreeConferenceCall.com, an Internet application through which Free Conferencing Corporation provides free calling services. All three entities were "largely own[ed]" and managed by Erickson.

("VoIP") called HD Carrier, LLC ("HD Carrier"), which is also owned and managed by Erickson. HD Carrier then terminated the calls to Free Conferencing. Thus, when an individual called one of Free Conferencing's services, the call would be routed from the IXC to Wide Voice, which would transfer it to HD Carrier, which would then connect the call with Free Conferencing.

Unlike Wide Voice, many LECs that had serviced Free Conferencing and other high-volume applications did not remodel their call paths following the *Access Arbitrage Order*, and thus had no choice but to leave the access stimulation business due to the increased cost of complying with the *Order*. Their departure left Free Conferencing with "an immediate need to migrate [the] traffic" that would have come through these LECs. Free Conferencing migrated this traffic to HD Carrier for termination. HD Carrier, in turn, designated Wide Voice as one of its tandem service providers to which the IXCs were to deliver the traffic. This arrangement allowed Wide Voice to continue to bill IXCs for tandem-switching-and-transport access charges on calls delivered to HD Carrier, despite the *Access Arbitrage Order*. Meanwhile, because other LECs had left the market, the volume of calls that Wide Voice transferred to HD Carrier for delivery to Free Conferencing significantly increased, causing call congestion and leading to charges totaling over $5 and $6 million annually.

## C. Procedural Background

Wide Voice billed IXCs AT&T and Verizon for tariffed tandem services for calls delivered to Free Conferencing. Wide Voice claims these charges were permissible under the *Access Arbitrage Order* as neither it nor HD Carrier technically engaged in access stimulation because Wide

Voice does not serve end users and HD Carrier is a VoIP service provider rather than a common carrier, and thus is not subject to the access stimulation rules.

AT&T and Verizon disputed Wide Voice's charges and filed an informal complaint with the FCC in April 2020. *AT&T Corp., AT&T Servs., Inc., & MCI Commc'ns Servs. LLC v. Wide Voice LLC*, Memorandum Opinion and Order, 36 FCC Rcd. 9771, 9778 (2021) ("*Order*"). The parties, however, were unable to resolve their dispute, and on January 11, 2021, AT&T and Verizon filed a formal complaint alleging eleven counts against Wide Voice. *Id.* In its final order, pursuant to 47 U.S.C. § 208 ("§ 208"), the FCC found that Wide Voice had violated § 201(b) and ruled that Wide Voice "may not bill AT&T and Verizon in connection with the traffic at issue . . . and must refund any amounts AT&T and Verizon already have paid." *Order*, 36 FCC Rcd. at 9779, 9787. The FCC found that Wide Voice's conduct was "unjust and unreasonable" in three respects: "[1] by restructuring its business operations so that it could impose tandem charges that it otherwise was not entitled to bill (Count V); [2] by intentionally causing call congestion in an effort to force the IXCs into commercial arrangements that required the payment of tandem charges (Count I); and, [3] for the same purpose, by unilaterally declaring a new interconnection point that does not create a net public benefit (Counts II and III)." *Id*. at 9779. The FCC then dismissed the remaining counts and did not address whether Wide Voice violated the *Access Arbitrage Order*. *Id*. at 9783 n.110.

Importantly, with regard to its first ruling on Count V, the FCC concluded that Wide Voice, in concert with closely related companies, Free Conferencing and HD Carrier, entered into a sham arrangement to rearrange traffic flows

for the purpose of enabling Wide Voice to continue imposing access charges, which it would otherwise be unable to charge under the *Access Arbitrage Order*. *Id.* at 9784. The FCC premised its decision on two findings: (1) Wide Voice, HD Carrier, and Free Conferencing were a common enterprise; and (2) these closely related entities rerouted traffic to evade the access stimulation rules. *Id.* at 9780, 9782.

Wide Voice petitioned for reconsideration of the FCC's ruling. *AT&T Corp., AT&T Servs., Inc., & MCI Commc'ns Servs. LLC v. Wide Voice, LLC*, Memorandum Opinion and Order, 36 FCC Rcd. 9771 (2021) ("*Reconsideration Order*"). The FCC dismissed the petition on procedural grounds and, in the alternative, denied it on the merits. *Id.* at 9879–80. Wide Voice timely petitioned for review of the FCC's merits decision but did not seek review of the *Reconsideration Order*.

## II.     Jurisdiction & Standard of Review

As a federal agency, judicial review of the FCC's actions is governed by § 706 of the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2)(A); *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Under § 706, we must determine whether the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "As a reviewing court, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *San Luis & Delta-Mendota*

*Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (quotation marks and citation omitted). In addition, we review the agency's factual findings for "substantial evidence," which requires "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nat. Res. Def. Council v. U.S. Env't Prot. Agency*, 31 F.4th 1203, 1206 (9th Cir. 2022) (quotation marks and citation omitted).

On the other hand, we review agencies' interpretations of statutes under the two-step *Chevron* test. *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–843 (1984); *see also Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.* ("*Metrophones I*"), 550 U.S. 45, 55 (2007) (applying *Chevron* analysis to FCC's § 201(b) construction). *Chevron* deference applies whether we are interpreting a statute by rulemaking or adjudication. *See City of Arlington, Texas v. FCC*, 569 U.S. 290, 307 (2013). Under step one of *Chevron*, we must determine whether Congress "has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. If "the statute is silent or ambiguous with respect to [a] specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. If so, "we defer at step two to the agency's interpretation so long as the construction is a reasonable policy choice for the agency to make." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.* ("*Brand X*"), 545 U.S. 967, 986 (2005) (quotation marks and citation omitted).

## III.    DISCUSSION

### A. Section 201(b) Violations Are Not Limited to Explicit Rule Violations.

Wide Voice contends that it has complied with, rather than violated, the *Access Arbitrage Order*, and that without an explicit rule violation, the FCC did not have the authority to find its conduct "unjust and unreasonable" under § 201(b). Wide Voice argues that the FCC's interpretation of its § 201(b) authority is unreasonable and undeserving of deference. *See Chevron*, 467 U.S. at 842. Wide Voice asserts that Congress *only* delegated the agency adjudicatory powers to find a § 201(b) violation where a carrier has breached an *existing* regulation or order, and thus, that the FCC exceeded its statutory authority. *See* 5 U.S.C. § 706(2)(B) (providing that courts may set aside agency action found to be in "excess of statutory jurisdiction, authority, or limitations, or short of statutory right"). We disagree.

It is well established that the FCC has broad discretion to "administer the Communications Act through rulemaking and adjudication." *Arlington*, 569 U.S. at 307. While the FCC, unlike a court, can "make new law protectively through the exercise of its rule-making powers," adjudication is just as necessary as "[n]ot every principle" "can or should be cast immediately into the mold of a general rule." *SEC v. Chenery Corp.*, 332 U.S. 194, 202 (1947). Adjudication empowers agencies to solve problems "despite the absence of a relevant general rule" to "deal with the problems on a case-to-case basis." *Id.* at 202–03. In fact, under § 208, the FCC must adjudicate a complaint regardless of whether the claims would be better suited for rulemaking.

47 U.S.C. § 208; *see AT&T Co. v. FCC* ("*AT&T I*"), 978 F.2d 727, 732 (D.C. Cir. 1992).

The FCC's determination here is no exception. Section 201(b) requires that "[a]ll charges, practices, classifications, and regulations for and in connection with [interstate wire] communication service[s], shall be just and reasonable." 47 U.S.C. § 201(b). The Supreme Court has affirmed that Congress intentionally left § 201(b) ambiguous and "delegated to the Commission the authority to 'execute and enforce' the Communications Act." *Brand X*, 545 U.S. at 980 (internal citations omitted). The Court has further established that the FCC may address this ambiguity by regulation or "orders with the force of law." *Metrophones I*, 550 U.S. at 58; *compare* 73 Cong. Ch. 652, June 19, 1934 *with* 77 Cong. Ch. 295, May 31, 1938, 52 Stat. 588 (demonstrating that originally the FCC could only enforce § 201(b) through adjudications until 1938 when Congress permitted the FCC to also prescribe rules as well).

While "there are statutory constraints on the Commission's power" under § 201(b), Wide Voice's reading of the statute is too narrow. *Metrophones Telecomms., Inc. v. Glob. Crossing Telecomms., Inc.* ("*Metrophones II*"), 423 F.3d 1056, 1068–69 (9th Cir. 2005), *aff'd*, 550 U.S. 45 (internal citations omitted). Congress delegated the FCC authority to "fill" "gap[s]" in interpreting § 201(b) that it could not otherwise anticipate or address. *Metrophones I*, 550 U.S. at 58.

The FCC exercised its authority under § 201(b) to hold Wide Voice liable for circumventing its newly adopted rules in the *Access Arbitrage Order* when the company devised a workaround. *See*, *e.g.*, *AT&T Corp. v. F.C.C.* ("*AT&T II*"), 317 F.3d 227, 232–33 (D.C. Cir. 2003) (affirming the FCC's

§ 201(b) adjudicative finding where the carriers' arrangement clearly "was devised solely in order to circumvent regulation"). Contrary to Wide Voice's assertions, the FCC need not establish new rules prohibiting the evasion of its existing rules to find a § 201(b) violation; to do so would belie common sense. *See Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 96–97 (1995) ("The APA does not require that all the specific applications of a rule evolve by further, more precise rules rather than by adjudication. . .").

Further, Wide Voice's contention that courts require a rule violation to find conduct unjust and unreasonable under § 201(b) is simply unfounded. While the Supreme Court in *Metrophones I* held that not "every violation of FCC regulations is [necessarily] an unjust and unreasonable practice[,]" the opposite does not follow. *See* 550 U.S. at 56. The cases Wide Voice relies on do not suggest otherwise, as they only speak to when private plaintiffs may sue in federal court for damages arising from violations of FCC rules. *See id.* at 53 (holding that plaintiffs may sue for damages where the carriers' conduct amounted to unjust and unreasonable conduct under an FCC rule); *Stuart v. Glob. Tel\*Link Corp.*, 956 F.3d 555, 561–62 (8th Cir. 2020) (affirming that claims alleging unjust and unreasonable charges could not proceed in district court because they lacked the necessary predicate action by the agency); *Havens v. Mobex Network Servs., LLC*, 820 F.3d 80, 89 (3d Cir. 2016) (same). This has no bearing on the FCC's own authority to find a practice unjust and unreasonable under § 201(b) in an adjudicatory proceeding.

Finally, the FCC's construction of § 201(b) is reasonable because it is consistent with the agency's longstanding precedent. *See Brand X*, 545 U.S. at 986 ("[W]e defer at step

two to the agency's interpretation [of an ambiguous statute] so long as the construction is a reasonable policy choice for the agency to make.") (quotation marks and citation omitted). Contrary to Wide Voice's depiction, the FCC's finding is not novel; the FCC has long relied on § 201(b) in adjudications to address unjust and unreasonable practices without finding an explicit rule violation. *See In the Matter of Total Telecomms. Servs., Inc*, 16 F.C.C. Rcd. 5726, 5733 (2001) ("*Total Tel Order*") (rejecting the argument that carriers did not violate § 201(b) because their relationship complied with FCC regulations); *AT&T Corp. v. Alpine Commc'ns, LLC*, Memorandum Opinion and Order, 27 FCC Rcd. 11511, 11530 (2012) ("*Alpine Order*") (finding a § 201(b) violation based "not upon an overarching rule, but upon the particular stipulated factual record in [the] case"); *In the Matter of AT&T Corp., Complainant*, 28 F.C.C. Rcd. 3477, 3491 (2013) ("*All American Order*") (finding a § 201(b) violation where carriers acted unjustly and unreasonably to circumvent the rules).[3] In fact, the FCC has already rejected this same argument. *See All American Order*, 28 FCC Rcd. at 3490 ("[T]he Commission has awarded damages (or permitted the complainant to seek damages) under Section 208 for violations of Section 201(b), even where no independent violation of a particular rule was found."). Thus, because the FCC's interpretation of § 201(b) is perfectly "reasonable," we defer to the agency in holding that the FCC may find a carrier's practice "unjust and

---

[3] *See also In the Matter of Sti Telecom Inc.*, 30 FCC Rcd. 11742, 11744 (2015) (finding a § 201(b) violation even though "the Commission has not adopted clear rules related to the advertising of prepaid calling cards"); *In Re NOS Commc'ns, Inc.*, 16 FCC Rcd. 8133, 8141–42 (2001) (same result).

unreasonable" without an explicit rule violation.  *See Chevron*, 467 U.S. at 845.

## B. The FCC Employed a Well-established, Legally Sound Definition of "Sham."

Wide Voice argues that the FCC's use of the term "sham" to characterize its new business operation is unsupported by precedent and, thus, that the agency relied on a novel and legally incognizable term, which rendered its decision "arbitrary and capricious."  Wide Voice challenges the FCC's reliance on *Total Tel Order*, *All-American Order*, and *Alpine Order* in its finding that Wide Voice, Free Conferencing, and HD Carrier entered into a "sham" practice.  *See Order*, 36 FCC Rcd. at 9780, 9786.  Wide Voice contends that according to these cases, neither it, the other entities, nor their business arrangement could possibly constitute a "sham."  Rather, Wide Voice asserts that the precedent establishes that a "sham" operation must involve (1) the creation of new entities (2) that lack proper business purpose and (3) have overlapping operations with another company.  *See Total Tel Order*, 16 FCC Rcd. at 5733 (finding a "sham" business scheme where one company was created for the sole purpose of extracting inflated access charges); *All-American Order*, 28 FCC Rcd. at 3487–88 (finding a sham arrangement where new LECs were created to generate higher rates and had no intention of becoming *bona fide* operations).  As Wide Voice, HD Carrier, and Free Conferencing were all established for proper business purposes before the call traffic at issue, Wide Voice argues that each of these companies fails to meet the FCC's own definition, and therefore, the FCC's decision is unreasonable.

While an "'[u]nexplained inconsistency' between agency actions is 'a reason for holding an interpretation to be an arbitrary and capricious change,'" there is no such inconsistency here. *Organized Vill. of Kake v. USDA*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (quoting *Brand X*, 545 U.S. at 981). Although some prior orders involved the creation of new shell companies, these facts were in no way critical to the FCC's § 201(b) findings. Rather, throughout these decisions, the FCC focused on the carriers' efforts to circumvent the rules through artificial means, whether through fake entities or other sham-like schemes. *See Total Tel Order*, 16 FCC Rcd. at 5734 (finding a § 201(b) violation where two highly intertwined LECs devised a workaround to "charge indirectly, through a sham arrangement, rates that it could not charge directly through existing tariffs"); *All-American Order*, 28 FCC Rcd. at 3490–91 (finding a § 201(b) violation where an LEC created a sham arrangement with competitive LECs and high-volume call providers to inflate access revenues and charge IXCs without violating any rules); *Alpine Order*, 27 FCC Rcd. at 11529 (although not explicitly addressing sham arrangements, finding a § 201(b) violation where LECs coordinated to move all their interconnection locations with IXCs to increase mileage charges without explicitly violating any rules). By finding that Wide Voice's actions constituted a "sham," the FCC reasonably considered Wide Voice's conduct in light of these analogous cases, as all were accused of devising schemes to indirectly inflate revenue in evasion of the rules. *See Order*, 36 FCC Rcd. at 9780, 9784. Thus, the FCC's use of "sham" here was "a reasonable exercise of its discretion" as it mirrored, rather than deviated from, earlier precedent. *See California v. FCC*, 75 F.3d 1350, 1358 (9th Cir. 1996) (internal citations omitted).

**C. Wide Voice Rearranged its Business Solely to Circumvent the Arbitrage Order.**

Wide Voice argues that even if the FCC has the authority to find it liable for a sham arrangement under § 201(b), the agency's ruling that Wide Voice only restructured its business to evade the *Access Arbitrage Order* was unfounded, and therefore, arbitrary and capricious. Wide Voice challenges the FCC's two primary findings, arguing that (1) the FCC had no basis to find that Wide Voice, HD Carrier, and Free Conferencing were a common enterprise, and (2) the FCC improperly assumed that these entities restructured their call traffic to evade the rules, when in fact they did so for proper business purposes. We disagree.

First, the FCC reasonably determined that Wide Voice, HD Carrier, and Free Conferencing were closely related, non-independent entities. *Order*, 36 FCC Rcd. at 9780–82. Substantial evidence demonstrates that these companies were "highly intertwined" as the evidence establishes that David Erickson was significantly involved in the operation of each company. *Id.* at 9780–81. In addition to being the owner and manager of HD Carrier, Erickson also owns Free Conferencing and founded Wide Voice. *Id.* at 9781. Despite Wide Voice's claims that Erickson has severed ties with the company, the record shows that Erickson is the settlor of the controlling trust of Wide Voice. *Id.* Erickson concedes that he has "personal knowledge" of Wide Voice's current business operations, including the company's strategic direction. *Id.* Furthermore, Wide Voice's management is enmeshed with the other organizations, as Wide Voice's current CEO, Andrew Nickerson, has an email address at Free Conferencing. *Id.* at 9782. Finally, some of the companies share customers in addition to administrative and

technical support services, further undermining Wide Voice's claims of independence. *Id.*

Second, the FCC reasonably determined that Wide Voice, HD Carrier, and Free Conferencing intentionally re-routed traffic to evade the *Access Arbitrage Order*. *Id.* at 9782–84. Foremost, Wide Voice admits that it shifted its business model in response to the *Access Arbitrage Order* by stopping service to end users and exclusively providing tandem switching after operating as an access stimulator. *Id.* at 9783. Furthermore, there is substantial evidence that at the same time Wide Voice transitioned its business, all three entities changed their call path in the following ways: (1) Free Conferencing moved its high-volume traffic, which had previously been directed to Wide Voice and other access stimulating LECs, to HD Carrier and (2) HD Carrier delegated Wide Voice as its tandem provider. *Id.* at 9783–84. Under this new model, Wide Voice and HD Carrier were not subject to the *Access Arbitrage Order* and Wide Voice was free to continue collecting high tandem access rates from IXCs. *Id.* at 9784. In addition, Wide Voice's decision to shift its operations coincided with other access stimulating LECs leaving the business rather than complying with the *Access Arbitrage Order*. *Id.* This development enabled Wide Voice and HD Carrier to assume Free Conferencing's and other high-volume call providers' traffic, allowing this common enterprise to dramatically increase its traffic without bearing the cost. *Id.* at 9783–84. In light of this evidence, the FCC reasonably concluded that Wide Voice, in coordination with HD Carrier and Free Conferencing, intentionally shifted its operations to circumvent the *Access Arbitrage Order*.

Wide Voice's alternative narrative does not convince us otherwise. Wide Voice contends that it restructured its

business to comply with, rather than evade, the FCC's new rules. While the FCC encouraged access stimulators to adjust their practices to comply with the new rules, this was not an invitation to contravene the main purpose of the *Access Arbitrage Order*. *Access Arbitrage Order*, 34 FCC Rcd. at 9069 ¶ 79. The FCC's central aim in promulgating the rules was to prevent access stimulating LECs from imposing costs on IXCs through tandem switching. *Id.* at 9079 ¶ 104. As Wide Voice blatantly sought to continue burdening IXCs while avoiding financial responsibility for its own call path through a technicality, the FCC had "cogent reasons" for discrediting Wide Voice's good faith arguments. *See Shire v. Ashcroft*, 388 F.3d 1288, 1295 (9th Cir. 2004); *Order*, 36 FCC Rcd. at 9785. Thus, as the FCC's two findings were rationally connected to substantial evidence in the record, the FCC reasonably concluded that "Wide Voice in concert with closely related companies, acted to evade the Commission's access stimulation rules by rearranging traffic flows to preserve the ability to impose tandem access charges on IXCs that it otherwise could not charge." *Order*, 36 FCC Rcd. at 9780.

Finally, Wide Voice challenges the FCC's finding that but-for "reorganiz[ing] operations so that the traffic terminates to HD Carrier instead of Wide Voice's end offices, the traffic would have triggered the revised access stimulation rule" and that "Wide Voice itself would have been responsible for the charges under the revised rule." *Id.* at 9784. Wide Voice insists that the FCC's supposed hypothetical rule violation was not possible because it is not bound by the *Access Arbitrage Order*. Wide Voice clarifies that (1) it could not qualify as an access stimulator because it no longer serves end users nor has a revenue-sharing agreement with high-volume call providers and (2) HD

Carrier could not be an access stimulator because it is a VoIP service provider and thus not subject to the new rules. In addition, Wide Voice argues that the FCC failed to prove that it has met or would meet the requisite traffic ratios, and thus, there is no evidence it "would have" triggered the *Access Arbitrage Order*.

These arguments miss the mark. Contrary to Wide Voice's depiction, the FCC did not find or even suggest that Wide Voice's new business arrangement meets the definition of an access stimulator under the *Access Arbitrage Order*. *Id*. at 9783 n.110. Rather, the FCC reasonably concluded that absent Wide Voice's workaround, Wide Voice, under its previous business model, would likely have triggered the new rules. *Id.* at 9784. This is a commonsense interpretation of the facts as even Wide Voice admitted to being in the "access stimulation business" prior to the FCC's release of the *Access Arbitrage Order*. *Id.* at 9779. Thus, we need not engage in speculation as Wide Voice suggests nor assess evidence of traffic ratios. Because the record establishes that Wide Voice, under its prior model, would have been prohibited from charging IXCs access charges for its call traffic under the *Access Arbitrage Order*, the FCC's finding was reasonable. *Id.* at 9784.

## D.  The FCC Afforded Wide Voice Due Process.

Finally, Wide Voice asserts that even if the FCC was permitted to find its conduct "unjust and unreasonable," it did not have fair notice that its practices were unlawful, and therefore, the FCC violated its right to due process. Wide Voice contends that it neither had reason to believe that the FCC could make a § 201(b) finding without a rule violation nor any notice that its actions could constitute a "sham" practice in light of the FCC's precedent. Wide Voice claims

it was blindsided by the FCC's decision as it was merely attempting to comply with the *Access Arbitrage Order* yet was *retroactively* penalized based on an unforeseeable wrong.

Under the APA, we may "set aside administrative action where [it is] contrary to constitutional right." 5 U.S.C. § 706(2)(B). Because Wide Voice has not shown that its due process rights were violated, there is no basis to set aside the FCC's decision. As discussed earlier, we are not persuaded that the FCC's actions here are novel. The FCC has an established precedent of both finding § 201(b) violations in the absence of a rule violation, *see supra* Section III(A), and explicitly holding carriers accountable for "sham" operations that circumvent its rules, *see supra* Section III(B). Furthermore, Wide Voice's assertions of good faith compliance are not persuasive. *See supra* Section III(C). Indeed, Wide Voice was involved in the rulemaking process that resulted in the *Access Arbitrage Order*, and thus, was aware that the FCC sought to preclude LECs from imposing access stimulation tandem switching costs on IXCs. There can be no doubt that it had "sufficient notice as to what behavior complies with the law." *See United States v. AMC Ent., Inc.*, 549 F.3d 760, 768 (9th Cir. 2008). Wide Voice thus had "fair notice" that rearranging its business model and call path to avoid qualifying as an access stimulator, while still collecting high access charges from IXCs for performing tandem switching, would constitute "forbidden" conduct in light of the *Access Arbitrage Order*. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (internal citations omitted); *Order*, 36 FCC Rcd. at 9786–9787.

Wide Voice lastly calls attention to the FCC's current rulemaking on whether VoIP service providers, like HD

Carrier, may be subject to access stimulation rules. *See* Further Notice of Proposed Rulemaking ¶ 17, VoIP FNPRM (FCC Aug. 6, 2021). Because the FCC's position on this matter is unsettled, Wide Voice contends it has been deprived of due process as its new business arrangement may not violate any new rules adopted by the FCC. This argument is meritless.

The FCC's proposed rulemaking on VoIP service providers has little bearing on this case. Whether the FCC determines that VoIP providers may qualify as access stimulators is irrelevant because the FCC did not find that HD Carrier was an access stimulator nor that it violated the *Access Arbitrage Order*. *Order*, 36 FCC Rcd. at 9783 n.110. Rather, the FCC found that Wide Voice, not HD Carrier, violated § 201(b) by using its knowledge that the FCC *currently* does not subject VoIP providers to the *Access Arbitrage Order* to devise a workaround of the rules. *Id.* at 9784–85. As the record demonstrates that Wide Voice was not only aware of this loophole, but that it took advantage of it, we fail to see any due process violations. *Id.*

## IV. CONCLUSION

Because the FCC's decision finding that Wide Voice violated § 201(b) "by restructuring its business operations so that it could impose tandem charges that it otherwise was not entitled to bill" was reasonable and lawful, we deny Wide Voice's petition for review. *Id.* at 9779.

**PETITION DENIED.**